# 25-599

*To Be Argued By:*
DAVID T. HUANG

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 25-599

UNITED STATES OF AMERICA,
*Appellee,*

-vs-

JESSICA STUART,
*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

## GOVERNMENT APPENDIX

DAVID X. SULLIVAN
*United States Attorney*
*District of Connecticut*
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700

DAVID T. HUANG
ELENA LALLI CORONADO *(of counsel)*
*Assistant United States Attorneys*

# Table of Contents

Transcript of October 15, 2021 Sentencing ........................................ GA1

Judgment........................................................................................ GA77

Petition for Compliance Review Hearing .......................................... GA83

Transcript of September 19, 2024 Compliance Review Hearing ..... GA87

Supervised Release Violation Petition............................................. GA112

Government's Motion for Detention ................................................ GA115

Transcript of January 23, 2025 Initial Revocation Hearing .......... GA125

Government's Supplemental Motion for Detention ........................ GA161

Final Report on Violation of Supervised Release............................ GA165

Email from USPO to parties dated Feb. 26, 2025........................... GA172

State of Connecticut Judicial Branch Conviction Case Detail re Case No. H15N-CR25-0352759-S ...................................................................... GA174

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA : No. 3:21CR83(JAM)
:
v. :
:
JESSICA STUART, :
: New Haven, Connecticut
Defendant : October 15, 2021
:
- - - - - - - - - - - - - - - - x

SENTENCING

BEFORE:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

APPEARANCES:

FOR THE GOVERNMENT:

OFFICE OF THE UNITED STATES ATTORNEY
915 Lafayette Boulevard, Room 309
Bridgeport, Connecticut 06604
BY: DAVID T. HUANG, AUSA

FOR THE DEFENDANT:

OFFICE OF THE FEDERAL DEFENDER
265 Church Street, Suite 702
New Haven, Connecticut 06510-7005
BY: MOIRA L. BUCKLEY, AFD

Diana Huntington, RDR, CRR
Official Court Reporter

**10:01 A.M.**

THE COURT: We are here today for what I understand is sentencing in the matter of United States of America v. Jessica Stuart.

Appearance of counsel, please, for the government.

MR. HUANG: Good morning, Your Honor. David Huang on behalf of the government. With me in court today are Special Agent Michael Ahearn of HHSOIG and Special Agent Melissa Gaud of the FBI.

THE COURT: Good morning.

MS. BUCKLEY: Good morning, Your Honor. Moira Buckley representing Jessica Stuart. Ms. Stuart is seated to my left. To the left of Ms. Stuart, Your Honor, is Vanessa Harrison. She is a 3L at Pace University School of Law and she is an intern in our office. May she sit at counsel table?

THE COURT: She's welcome to, yes. And welcome to her.

And Ms. Stuart, are you doing okay today, all considering?

THE DEFENDANT: Yes.

THE COURT: Okay. Please be seated.

We're joined as well by our probation officer, Mr. Thomas Kilroy. Thank you for your work on the

Presentence Report and the other materials in the case.

So I don't know if there are victims who are perhaps watching by Zoom or --

MR. HUANG: Your Honor, we have, consistent with our obligations, notified the victims in this case. I believe some of them may be on Zoom. As of now, we haven't gotten prior indication that they wish to address the Court directly. Certainly Your Honor can inquire.

THE COURT: Maybe I'll just do that.

I don't know -- my video access here is a little bit limited. Are there any victims who would at some point during the hearing like to be heard? If they would wish to do so, they need to tell me probably now if they would wish to speak.

MR. TUNG: Your Honor, can you hear me?

THE COURT: Yes.

MR. TUNG: My name is Steve Tung. I had provided some information to the prosecution. I would be happy to either have that statement read in court or I would be happy to make a comment myself.

THE COURT: I have a letter from Mr. Tung which I've certainly reviewed.

I guess, Mr. Huang, the question I'd have about Mr. Tung's speaking is it seems like the issues that he raises don't concern the offense, either of the two counts

of conviction in the case. Ordinarily, probably even if somebody has information to offer, I would accept that information typically by means of a letter. I'm not sure I would have that person speak in open court. But do you have a different view of it?

MR. HUANG: Your Honor, we defer to the Court. The government agrees with Your Honor's assessment that he is not a victim of the crimes charged that bring us here today. We submitted the letter just for purposes of the Court's information about Ms. Stuart and her background. We defer to the Court on that. I have previously explained that issue to him.

THE COURT: And Mr. Tung would understand that the Court's authority in this case, I know he talks in his letter, for instance, about losing some I believe $65,000, as he quantifies it, as a result of a rental relationship --

MR. HUANG: Correct, Your Honor.

THE COURT: -- with Ms. Stuart. But it's really not the issue, the crime at issue here of conviction.

So Mr. Tung, I appreciate your interest in speaking. I appreciate your letter as well. I don't think we're going to have you speak in open court today. Is that okay, sir?

MR. TUNG: Understood, Your Honor. Thank you.

THE COURT: But I appreciate and certainly welcome your observance of all that goes on today and welcome the observance by anyone else who is watching on Zoom.

Okay. So back on I believe the 2nd of June of this year Ms. Stuart did appear before the Court. At that time she entered a plea of guilty which was accepted by the Court to two criminal counts, one was for health care fraud and the other was for use of a false identification in connection with a health care fraud crime.

A Presentence Report has been prepared, of course. I have looked at the Presentence Report. There's been two addenda to the Presentence Report. There have also been numerous submissions from counsel, under seal much of it.

And I know that, Ms. Buckley, you submitted just very recently an additional letter from Ms. Stuart which I've reviewed as well.

MS. BUCKLEY: Correct, Your Honor.

THE COURT: And I think I've reviewed everything else that's of record in the case. Is there anything else the parties want to call to my attention in terms of making sure I've reviewed it?

MR. HUANG: No, Your Honor.

MS. BUCKLEY: No, thank you.

THE COURT: Okay, great.

Ms. Stuart, we're obviously proceeding today with these masks on. They're a pain in the neck, everybody knows that. It's much harder to hear each other, I know that. Are you able to hear me so far?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If at any point anybody who is addressing the Court wishes to remove their mask, they're welcome to do that for that purpose. Otherwise, I request that you keep the mask on. There may be at points in time when I remove my mask at points in the hearing.

Have you read the Presentence Report, Ms. Stuart? And then there's the two addenda to the Presentence Report from Mr. Kilroy. Have you read them?

THE DEFENDANT: Yes.

THE COURT: Have you discussed them with Ms. Buckley?

THE DEFENDANT: Yes.

THE COURT: Okay. And at this point -- you can be seated -- I'll just ask counsel if there's any kind of factual statements or objections to just the facts that are set forth by Mr. Kilroy apart from the Sentencing Guidelines calculations.

MR. HUANG: From the government, no, other than the comments that we had previously provided and I think

are included in the addenda.

THE COURT: Understood. Okay.

MS. BUCKLEY: I have a few, but I also just want to point out, Your Honor, with regard to the second addendum, we received it on Wednesday, I believe the 13th.

THE COURT: Yes.

MS. BUCKLEY: I have not been able to see Ms. Stuart since then, just given schedules.

THE COURT: Of course.

MS. BUCKLEY: She was reading through the majority of that this morning. I think she had a couple of letters that she had not finished reading. They were in the second half of the addendum. I have described them to her, but she didn't get to read through the entirety of each one. And those letters will be subject to part of my comments.

THE COURT: Of course. So let me do this. I'm going to take a five-minute recess, whatever is necessary.

MS. BUCKLEY: I appreciate that, Your Honor.

THE COURT: I want to make sure Ms. Stuart has read the letters thoroughly and had a chance to talk to you about them.

I also want to let you know about one possible wrinkle. I have a jury that's out in another case I've been trying this week. It's possible we might get a note

from the jury. I've actually instructed my law clerk to bring that note and give it to me if we get one. It's possible we'd have to interrupt the proceedings for that purpose. I just want to let you know that. No disrespect, Ms. Stuart, but it's important for me to respond to a jury note if I get a jury note.

We'll take about a five-minute recess and resume when you're ready.

(Whereupon, a recess followed.)

THE COURT: Please be seated.

Ms. Buckley, are you done reviewing it?

MS. BUCKLEY: Yes, Your Honor.

THE COURT: Is that enough time?

MS. BUCKLEY: Yes. Thank you.

THE COURT: I asked whether there were factual objections to the Presentence Report. Are there some?

MS. BUCKLEY: Well, I guess I'll clarify. There aren't necessarily factual objections. We have objected to certain things being included in the report proper, the original report.

THE COURT: Okay.

MS. BUCKLEY: I believe Probation Officer Kilroy addressed them. I think in the manner in which he addressed them, I don't think I have any factual objections. I suppose I'll let Your Honor be the judge of

the rest of my objections if they're technically considered factual.

THE COURT: Are you saying that there's something that's inaccurate?

MS. BUCKLEY: Well, we're not objecting to any facts related to the offense. I think I'm probably reading too narrowly factual objections. We do object, for instance to -- I apologize. I want to make sure I don't have my pages out of order here.

With regard to what were Paragraphs 62 and 63 and are now Paragraphs 64 and 65 in the other arrests section, it indicates that it's unknown how those charges were resolved. You know, I guess -- I suppose this is somewhat anecdotal, but when you look up those charges on the State of Connecticut judicial website, the case inquiry, they're not there. I think I probably argued these points before Your Honor and many other judges in the district. That typically, particularly in the types of cases that I believe those paragraphs encompass which I believe are susceptible to family violence program disposition, that typically indicates that the charges have been nolle'd and, if they're older than 13 months or if the disposition date is older than 13 months, dismissed. It's sort of impossible here to prove anything without actually having Ms. Stuart go to the courthouses,

fill out a certificate of identity, and get proof that those charges have been disposed of.

So I guess my point is sort of the absence of those charges pending is enough to -- you know, when it walks like a duck, talks like a duck is what I'm trying to say. I think my statement in my objections that those charges were either nolle'd and/or dismissed is a fair statement. And I think the PSR should indicate as much because, again, when you look up those charges that are less than ten years old and would be on the State of Connecticut judicial web page case inquiry, if they were still pending, they're not there. And again, I could belabor this point --

THE COURT: How about if the Presentence Report simply adds a sentence stating that it is defendant's position that these two charges were dismissed?

MS. BUCKLEY: Yes. I believe he states that. I believe he incorporates that -- or maybe he didn't. If he didn't, yes, I would ask that that be added in.

THE COURT: Is that in there, Mr. Kilroy? Did I miss that?

THE PROBATION OFFICER: Your Honor, I don't believe so. I can add that, an addendum.

THE COURT: Okay. That would be great for Paragraphs 64 and 65.

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: I'm not sure whether the charges have been dismissed in the absence of some further allegation that the information there is inaccurate. I'm not sure that that would be material to the sentence. In fact, I definitely don't think it would be material to the sentence I would impose, but I understand the reason to ask that that additional information be included. Or if you have reasons that you're still concerned, please share them with me.

MS. BUCKLEY: It's my belief, Your Honor -- Your Honor knows better, obviously, because you impose sentence. My concern is less about it impacting the sentence, because I believe Your Honor understands what I'm trying to say. My bigger concern is that if she's sentenced to custodial term, the report follows her to the Bureau of Prisons and, you know, to the degree -- and I can't say I know this with any certainty, but to the degree that the report is relied on in figuring out if she has any pending charges and release dates, I just -- I wouldn't want there to be an indication that she has some pending charge. And we just don't know what happened to it. It's not pending. He didn't refer to it as pending, I should correct that. But I do think the manner in which it's described --

THE COURT: Okay. So I think if it simply says that it is the defendant's position that both of these charges were dismissed, that's probably enough.

MS. BUCKLEY: I think that's as far as -- I appreciate that, Your Honor. Thank you.

THE COURT: Of course if you had more information and in the event that Ms. Stuart were subject to a term of imprisonment and if she wanted to call that to attention and she had additional evidence that in fact it had been dismissed in the way that you discussed, her going to the court and getting the records, I'm sure that could be presented.

MS. BUCKLEY: Thank you.

The other objection relates to prior Paragraph 79, currently Paragraph 81, and it is the use of Mr. White's statements.

So just to give Your Honor a little history, you know, we sat down for the presentence interview I want to say August 4 because I believe I had been in front of Your Honor for a sentencing that day and then headed over to meet Mr. Kilroy. And at the time Ms. Stuart was still in a relationship, at least as far as she was aware, with Mr. White. It's my understanding, as stated, Mr. Kilroy spoke to Mr. White after that relationship fell apart --

THE COURT: Okay.

MS. BUCKLEY: -- after an arrest. And I feel very strongly that in that case perhaps the interview should not have occurred because -- and Mr. Kilroy is a very straightforward, I think he's a terrific PO, I don't mean to disparage him, but just in general when we have these interviews, the particular way it goes is the probation officer will say to you is there anyone you want me to speak to. It's not mandated that they get to talk to everyone in your life. The defendant gives a name and the number and the contact information so that the probation officer can corroborate. And usually, and in Ms. Stuart's case, certainly, you give the name of someone who knows you. You're not going to give the name of someone who wants to say negative things about you, might have a motivation, whether true or not. And I think, given the change in those circumstances, the very drastic change in that relationship and the fact that Ms. Stuart was facing charges, I believe, unless I'm missing sort of a sequence, I don't think that Mr. White should have been talked to or at least what he said included in the report. Perhaps I should have jumped on the ball a lot faster and said, hey, have you talked to Mr. White yet. What's done is done. I think what Mr. White said should be stricken from the report. As I said, whether some of it's true or not, I think he isn't someone she would ask to corroborate

her statements or say anything on her behalf. So that's --

THE COURT: Sure. Is a probation officer restricted in terms of only talking to people that the defendant wants him to?

MS. BUCKLEY: Well, not necessarily. I mean, obviously they can speak to -- I believe they can speak to victims. Not to put the heat on Mr. Kilroy, I'm sure he can educate me on their guidelines, but it's the context in which Probation gets that name and number. I mean, I've had plenty of circumstances where a probation officer will say to my client, "Well, can I talk to your child's mother to corroborate X, Y, and Z?" And the client will look at me because they don't have a good relationship, and I'll say, "You know what? I don't think that would be helpful. Why don't you talk to my client's sister?" That's usually how it goes. So had that relationship broken up when we had the PSR, I probably would have corrected that and said, no, maybe don't talk to him. So I don't think it should be in the PSR given how we pass on or why we pass on that information.

THE COURT: Suppose you have a client and the client says, "Speak to my mother." And the probation officer does that. To the client's surprise, the mother says adverse things. And the probation officer dutifully

puts that in the Presentence Report. Should that information be stricken from the Presentence Report on the grounds that it disappointed the defendant's expectation of what the mother would say?

MS. BUCKLEY: No. I think that's a bit different, though, from this scenario. I mean, you have to, to some degree, rely on your client's assessment of their relationship with that person. Not to get too far into the conversations I have with hopefully most of my clients if I'm doing my job, who do you think will be helpful? Who do you think can corroborate some of the things that you've said? You don't want to give a name of someone who might have a reason that is real, imagined, you know, to say something negative about you. Certainly mothers can say both, and sometimes we have to deal with the mixed bag.

But here it's a bit of an extreme example of -- again, I think I have the timing right, although Mr. White was spoken to after Ms. Stuart was arrested, you know, the information appeared to corroborate information learned during the investigation, it seems like he was more so turned into someone to corroborate negative allegations against Ms. Stuart. But she gave the name as someone, you know -- and if Mr. White had said those negative things pre-breakup of the relationship, pre Ms. Stuart being

charged, pre some of the allegations she's made about him, I wouldn't be making this argument. But I think, given that turn and I think the potential for statements that may not be entirely true or true at all, motivations that may not be the best, I think it should be stricken.

THE COURT: I see.

Mr. Huang.

MR. HUANG: May I make a suggestion, Your Honor, which is that either the PSR or the addendum, I think if it's important for Attorney Buckley or her client, the report to reflect that the relationship changed from the time they suggested that Officer Kilroy talked to Mr. White to when the PSR is written, I think that is factually accurate and should be included. So if she's saying that that may suggest a sort of bias or change in how he feels about her, then that would be included in the PSR and of course Your Honor to take all that into appropriate consideration.

THE COURT: Does the PSR say in the first place that Ms. Stuart asked the probation officer to speak with Mr. White?

MR. HUANG: I don't believe so, Your Honor.

MS. BUCKLEY: May I, Your Honor?

THE COURT: Yes.

MS. BUCKLEY: I don't believe it says it, but

it's listed in the marital and personal relationships. I was there when he asked for the collateral contact, but also, I guess I'm sort of testifying. But also it's typical the person you're in the current relationship with is listed. Whether they're talked to or not, again, is dependent on whether the defendant gives the name. I don't want to speak for Mr. Kilroy, but I think if she said, "You know what? I don't want you talking to my boyfriend," I don't know that he would talk to the boyfriend. Because I've had plenty of circumstances where wives, girlfriends, ex-girlfriends, while they get listed in the marital and personal relationships, the contact information isn't given.

And I can tell you some probation officers go so far as to say, "I'm not looking to get information -- I'm not looking to say too much or give too much, I just want to corroborate some of what you've told me." So I think this sort of takes on a different purpose by including Mr. White when had she known what was going to happen and he'd be talked to after it happened, she probably wouldn't have given the name and number. And I certainly would have advised her not to.

THE COURT: I get that.

I take it you're not arguing that the probation officer has some limit on who he is able to talk to, are

you? You're not saying there's some sort of legally enforceable limit on who a probation officer talks to when they do a presentence investigation?

MS. BUCKLEY: I can't cite anything other than the practice of when they say "give me the name to corroborate," it's up to the defendant. And I just think that the timing of it seems somewhat unfair to me.

THE COURT: So you're saying there's a practice there.

MS. BUCKLEY: Yes.

THE COURT: You're concerned that the name was given with the expectation that Mr. White would say something favorable, circumstances changed from the date when the name was given such that by the time Mr. White was spoken to, they had an unfavorable relationship and he gave unfavorable information.

MS. BUCKLEY: Yes. And if I could just clarify, Your Honor. The name and number given and the idea is to corroborate information, if he can. Ideally, you want them to say something favorable, but it's more about corroboration. But I think that the rest of Your Honor's description is certainly accurate.

THE COURT: And I'm going to ask you a question which you can decline to answer, if you wish to.

MS. BUCKLEY: Sure.

THE COURT: I guess my question is, I know you said you never reached out to Mr. Kilroy and said please don't talk to this person, but are you -- again, don't answer this question if you don't wish to. Were you ever instructed by your client to do so and you failed to do so?

MS. BUCKLEY: Let me just make sure she's okay with me answering this.

(Pause.)

MS. BUCKLEY: Your Honor, I didn't reach out to Mr. Kilroy. I was never instructed to. If I may just add a little bit. There were several weeks between the interview -- or the interview wherein she gave the name and number, I believe it was given in the August 4th interview, and then the breakdown in the relationship and Mr. Kilroy talking. So, again, I have no idea whether he was going to talk to him in that period. I'm not trying to defend myself. I was never instructed to call him. I didn't call him.

THE COURT: Were you -- I take it, were you aware that there had been a breakdown of relationship between the time of the Presentence Report interview and -- when Mr. Kilroy met with your client and you and then later when he met with or spoke with Mr. White?

MS. BUCKLEY: I was aware weeks later at the end

of August, I believe it was near the end of August when Ms. -- I think I was aware sort of in realtime when Ms. Stuart went to St. Vincent's the first time was prior to her arrest -- one moment, Your Honor.

THE COURT: Sure.

(Pause.)

MS. BUCKLEY: And it appears to me that Mr. Kilroy spoke to him even later, you know, a few weeks later given --

THE COURT: August 31, I think, according to Paragraph 81.

MS. BUCKLEY: I'm sorry, Your Honor, I was still in the addendum.

I guess what I would say, and I don't know how much this is worth anything, but I don't know if I was aware -- and this is probably my failing -- that he hadn't talked to him prior to the breakdown. And I'm just looking at the date of the report, the first draft of the report. I don't know if he spoke to him during the second or first draft, I'm assuming, because I objected to it.

So the first draft of the report was disclosed September 3rd. So that's how -- that's when I became aware when he spoke to him. I just, you know, again, I didn't know that he spoke to him after the arrest until then.

THE COURT: All right.

MS. BUCKLEY: But to be really clear, you know, I'm not interested in defending -- if I have to defend myself at some later point, I would. I wish I had been more on top of it and called him immediately when I heard about the breakdown in the relationship and said, hey, don't talk to Mr. White. I didn't. But I still think that, given the amount of time that passed, it was certainly plausible that he would have talked to him when things were okay.

THE COURT: I see. Okay.

MS. BUCKLEY: Unless Your Honor has any more questions about that one --

THE COURT: I guess what I'm going to do here is I'm going to overrule the objection to the inclusion of the information received by the probation officer from Mr. White. I think the general rule is that a sentencing court can consider all information, that there's no restriction placed on the information that the Court can consider. I also don't think that there's any legal limitation that I know of, there might be an informal practice, but there's no legal limitation on a probation officer's authority to reach out to anybody, frankly, for information that may be relevant, pertinent to a sentencing judge's consideration. I think that the

circumstances here in which Mr. White's name was given to the probation officer at the direction of counsel was perfectly appropriate. The reason why I asked about the internal communications and about the time gap issues were to satisfy myself that there had not been some kind of an active ineffective assistance of counsel, and I think it's clear that there was not, in my view. I've had Ms. Buckley before me in many, many cases. In my view, she's one of the most effective attorneys that appears before me. And I don't think that it was ineffective assistance of counsel at all for Ms. Buckley not to have contacted the probation officer and asked him not to speak to Mr. White, because I think that the probation officer could well have decided in any event to speak to Mr. White or to receive information from Mr. White.

So I'm really -- I know that Ms. Stuart is disappointed that the information is in the Presentence Report from Mr. White and that he's given adverse information in the case, but I just don't think there's legal grounds to exclude it. So that's my ruling on that.

MS. BUCKLEY: Thank you, Your Honor.

Our final objection, Your Honor, is related to the letters in the second addendum that we received two days ago. Obviously I don't think there's any basis to object to letters that are related to this offense,

whether they're letters written by victims of the offense or letters to place things in context. And I also, you know, I don't believe I can argue that Your Honor can't consider some of the additional letters such as the one written by the gentleman who spoke up on Zoom.

THE COURT: Mr. Tung.

MS. BUCKLEY: Yes.

A couple of things. Again, Your Honor has -- there's a wide latitude of things that you can consider. I certainly think that I can argue that the weight of those letters should be taken in proper context. Mr. Tung, the Molines, if I'm pronouncing the name correctly, they're individuals who -- they're pending criminal cases against Ms. Stuart in state court and those individuals or at least some of them are alleged victims in those cases. I would just ask that Your Honor consider, again, motivations and also understand that I think it would be ineffective of me to go too far into saying anything about those cases because Ms. Stuart has to deal with them in state court and anything she says or even any sort of theory I propound related to those cases could be used in a negative way against her.

But as far as the PSR is concerned, while Your Honor can consider those letters and while the government can do what we so often do, which is file

letters attached to our sentencing memo, I don't think those letters should be included in the PSR addendum. And again, not so much as it relates to Your Honor's consideration and decision on sentencing, but as it relates to this PSR following her throughout potential custodial sentence and supervision. It's just additional, you know, accusations and claims that are in the state court but I don't think should be in the PSR painting her, you know, in a worse light than is already painted based on the offense proper, the federal offense. I think it goes a little bit farther than is necessary for the PSR. Your Honor can consider it at sentencing, but I'd ask that they be stricken from the PSR. They could be made court exhibits, I suppose, or government exhibits, but I don't think they're appropriate here.

THE COURT: All right.

Mr. Huang.

MR. HUANG: Your Honor, as I think Your Honor alluded to, under 3661 Your Honor can consider any information that it deems relevant for the purposes of sentencing.

THE COURT: Fix that microphone so we can hear you better.

MR. HUANG: Can you hear me better?

THE COURT: I think we're okay, but if our

reporter needs help.

MR. HUANG: I pushed the button, how about that, Your Honor.

THE COURT: Much better.

MR. HUANG: As I was saying, under 3661 Your Honor can consider any information that it deems relevant for its sentencing.

Just to provide a little bit of context, Your Honor, some of the people who we ultimately submitted letters to Your Honor reached out affirmatively to the government. And so obviously within the context of the investigation, I think it's fair to say we reached out to some of the people who ultimately submitted letters because they were pertinent and relevant to the purposes that we were conducting the investigation. But after Ms. Stuart's guilty plea before Your Honor in June, I believe there was a press release, some people reached out to our office or to the agencies directly, and upon talking to them, that's how those letters came about. And the timing of the letters is also important in the sense that, given Your Honor's scheduling in terms of the briefs, it wasn't a situation where we could wait until we received the defendant's sentencing memo before we determined what letters, if any, were appropriate to submit to Your Honor. These things were sort of in the

works or at least contemplated by these people for a while. So that is perhaps why they are the way they are. So I just wanted to give the appropriate context for that.

But in terms of actual point that Attorney Buckley made, whether they are attached as an addenda to the PSR, whether they were summarized by Officer Kilroy, they would be in the PSR and fairly so anyway. I'm not sure that there is a basis to strike them for the same reasons that Your Honor decided with respect to Mr. White's interview.

THE COURT: I see. All right.

I will overrule the objection to the letters being part of the second addendum to the Presentence Report. I think it's appropriate in terms of information that the probation officer receives and should forward to the Court. It's really the probation officer's job to gather information that may be material to sentencing. That said -- and also I would say that I think having these letters there in addition to what was already properly in the Presentence Report concerning other arrests or charges, I don't think adding the letters such as, for example, a complaint by a former landlord about activity, for example, is something that I can see causes and would cause prejudice in terms of the Bureau of Prisons in the event that the Court were to impose a

sentence of imprisonment. And so I'm going to overrule that objection.

I'm fully aware, though, why Ms. Stuart is before the Court today. She's facing sentencing on two charges to which she's entered pleas of guilty here. She's not being sentenced today on the basis of additional conduct that is alleged to be criminal or fraudulent by some of the letters that I've received. I think I can consider them, but I do consider them in that light, in the light that they're not what she's here to be sentenced for. I look to them more in terms of the character issues here as a reflection on that, just as Ms. Stuart is fully entitled and has in fact submitted affirmative letters on her behalf.

Any other factual objections to the Presentence Report?

MS. BUCKLEY: No, Your Honor. Thank you.

THE COURT: So it looks like the Presentence Report calculates the Sentencing Guidelines, it calculates a final offense level of I believe 17 and a Criminal History Category of II, level II. And that that would correspond to a recommended sentencing range of between 27 to 33 months of imprisonment; a period of one to three years of supervised release on each count; a $10,000 to $95,000 criminal fine range, of course based on the

Court's consideration of ability to pay; and I think that the parties have agreed on a restitution figure in the amount of $339,561.41; and there would be a $200 special assessment, $100 on each count. Does that sound right?

MR. HUANG: Yes, Your Honor.

MS. BUCKLEY: Yes, Your Honor.

THE COURT: Ms. Stuart, whenever the Court imposes a sentence, whether it's a sentence of probation or if it's a sentence of imprisonment, it imposes terms of release. So it could be terms of supervised release following a term of imprisonment or terms of probation. The probation officer here at the very end of the first draft of the Presentence Report -- and I don't know if you have it right in front of you there, but it's in Paragraph 139.

MS. BUCKLEY: She has it in front of her, Your Honor.

THE COURT: It's at page 69 running over to page 70, I believe, of the Presentence Report. It sets forth certain what are recommended special conditions.

And I wanted to make sure that -- they include, for instance, number one is for educational and/or vocational services program. I know that Ms. Stuart is now taking classes at Goodwin University. And so to that extent, it looks like there's a reference to high school

equivalency preparation. I think you have your GED already, which is why you're at the college level. If I were to impose that condition, I would take out just the word "high school equivalency preparation" because it's not applicable there.

And then the second condition is not to seek or maintain employment in the field of applied behavioral analysis unless you had prior approval of the Probation Office.

The third is to give financial information to the Probation Office for the purposes of ensuring that you're keeping faith with your restitution obligations that you would have.

The fourth, of course, is to pay restitution. It says to pay it in a lump sum, if you were to have the money now. Otherwise, you would pay at a rate of $100 per month or 10 percent of gross monthly income, whichever is higher. Of course, that could be adjusted if for some reason that you had an ability to pay that is greater or lesser over time.

Then there's a mental health treatment recommendation there you can see. And I think that's talked about, of course, in the Presentence Report.

Condition Number 6 is a search condition. I have to say I'm not sure that I would wish to impose that

in this kind of case, but I'm happy to hear from counsel about that. That's Condition Number 6. And this is not, it seems to me, a contraband kind of case, the kind of case that I usually impose for somebody who has had illegal possession of narcotics or weapons.

Condition Number 7 is to have no direct or indirect contact with -- I'll just use the initials JS, who is the person whose name was misappropriated here or to use her name in any way.

Then the last is to participate in inpatient or outpatient substance abuse treatment and testing.

Do you anticipate any objections, Ms. Buckley, to those specials conditions?

MS. BUCKLEY: I do not, Your Honor.

THE COURT: Government want to be heard on any of those?

MR. HUANG: Your Honor, the government had proposed an additional special condition in its sentencing memorandum --

THE COURT: Okay.

MR. HUANG: -- which is not here in Paragraph 139. I don't believe the defendant objected to that in their reply brief. So if Your Honor has --

THE COURT: I have it here, page 13, 14.

MR. HUANG: Correct, Your Honor. We believe

that the occupational restriction that we propose would be common sense and appropriate given the facts and circumstances that bring us here today. So the government proposes a special condition that Ms. Stuart not seek or maintain employment in the field of applied behavior analysis without the prior approval of the U.S. Probation Office.

THE COURT: Paragraph 139, Condition Number 2 there?

MR. HUANG: Yes. Thank you, Your Honor.

THE COURT: Okay, great. I think it's covered.

All right. And then the Court ordinarily would impose what are called the mandatory conditions, of course, that Ms. Stuart would not commit another federal, state, or local offense; that she would -- hold on a second. I don't seem to have -- oh, I do. Pardon me. That listing over here.

Not to unlawfully possess a controlled substance; to refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days and at least two periodic drug tests thereafter; of course to make restitution; pay the special assessment; and to cooperate in the collection of a DNA sample. Any anticipated objections to those?

MS. BUCKLEY: No, Your Honor.

THE COURT: And then there are the standard conditions that are set forth in the Sentencing Guidelines such as to report to the probation officer, to maintain employment and the like. Any anticipated objections there?

MS. BUCKLEY: No.

THE COURT: All right. I think I've gone through pretty much all the technical matters that we needed to do. Anything else technically that I need to cover?

MR. HUANG: One thing, Your Honor. Did Your Honor intend to adopt the factual findings of the PSR as its own findings?

THE COURT: I do. If I didn't make that explicit, I adopt those and adopt the guidelines calculations as well.

MR. HUANG: Thank you, Your Honor.

THE COURT: All right. I think, Ms. Buckley, would you like to proceed first before I hear from the government. Of course, Ms. Stuart, you're certainly welcome, if you'd like to, to address the Court or if you have any family members, supporters, anybody else who -- it doesn't appear they are here in the courtroom, but if they are participating by Zoom and they wish to be heard, you'd be welcome to have them speak as well.

Ms. Buckley.

MS. BUCKLEY: Thank you, Your Honor. It's my understanding that she doesn't have anyone who is participating by Zoom.

Your Honor, this has been -- Your Honor and I have handled, not together, but I have had cases together with the government in front of Your Honor that are, you know, beyond anything we can ever imagine that people have done. They're difficult cases. Some of them you can understand why the person did what they did; it doesn't excuse it. I think we've had all levels of cases. This is a case that I have found I've just scratched my head repeatedly. I've only had it a few months, which is not to --

THE COURT: Of course.

MS. BUCKLEY: Which is really just to underscore sort of it's an overwhelming case in just this short amount of time. There's a lot of information. A lot of it paints Ms. Stuart in a very negative light, there's no question. She knows. She knows that that's the nature of this. And I am fully aware and was fully aware before any briefing that anything we argue, anything we represent that comes from Ms. Stuart is going to be doubted, that if we don't have independent corroboration of everything, you know, she says or does or we try to represent as sort of

somewhat of an explanation, somewhat of mitigation to Your Honor, it's going to be doubted. I can't fault anyone. I can't fault Probation, I can't fault the government, I can't fault Your Honor for doubting at some level what we put forward. It sort of becomes like if she says that she was traumatized as a child, how can we believe that because, A, look at this offense and look at the points at which she lied, the lengths she went to, how long it lasted. And I don't mean to take Attorney Huang's argument, but it is what it is. Is this the boy or the girl who cried wolf when she says, "You know what? I had this childhood that was just a mess." I mean, I'm not going to get into details because I want to sort of preserve some level of privacy for her. But I think Mr. Kilroy -- and I can remember that day sitting there for a very long time listening to this, Mr. Kilroy captures I think as best as anyone can the utter chaos that she came out of.

I suppose Your Honor could doubt that. The government can doubt that. I believe it. And I believe it because I'm not a psychologist and I didn't get an evaluation here and I have my reasons for that and I don't think I need to get into them. It's protected. And I don't think it's anything negative about Ms. Stuart. But I just know that there are certain limitations to certain

things I can do.

And, you know, I think the far more plausible story is that she is someone who came out of a chaotic and traumatic background and that's why she's at the point she's at now. That's why we're standing here. It's a lot easier when I have someone who is obviously drug addicted, who has had, you know, corroborated mental health issues for years. But that's not really how life works. People who have come out of chaos, come out of trauma, have mental health issues, they don't always do what they're supposed to do. So I can't offer Your Honor much by way of third-party corroboration that she was abused in the manner we described, that she wasn't parented properly, because we're not just talking about the most obvious abuse but we're talking about an utter lack of nurturing by her parents. And frankly, again, with no psychology degree but a few years around, professionally and personally, it's not a surprise that she has approached life in a similar pattern of what she came out of, which is not representing reality, creating a reality to look a certain way to maintain a surface-level normalcy as she refers to something like that in her letter.

So what does that matter here? I know the government has said, what does that matter? Even if she has been abused, even if she had this horrible childhood,

what does it matter here? It matters here because it's mitigation. It's mitigation for her conduct. She needs to be monitored. She needs mental health treatment with no missteps and no excuses. And she needs that in the community.

She has very serious mental health issues. She's depressed. She has PTSD. There's talk about a personality disorder. She may be a borderline personality from some of the things I've seen, Your Honor. Individuals like that can be treated. And she is someone who needs that treatment.

If there's a doubt that she has been abused, I would ask -- or that she came from a traumatic background as she describes, I would ask that everyone give her the benefit of that doubt and consider it today.

Now, I've seen lots of submissions from the government that went to Probation that we were just arguing about. And I guess what I would say about many of them is that I'm sure there are more than valid points in every single submission Your Honor's seen, but I would ask that you also, you know, consider some of these submissions with a grain of salt. And I'm sorry I'm probably going to insult her. She's a lovely person to deal with one-on-one, but she's frustrating in that she's got a lot of complexities and you don't always have a

total understanding of exactly how something occurred, not because she's flat-out lying but because I truly believe she sees things in a way that it's distorted to a certain degree. And I think that distortion comes from her background.

So when I look at the GAL's letter, I understand. I can't fault the GAL for getting involved in the case. And I'm not going to make this about the GAL despite my reply. I felt I had to do that for a host of reasons.

THE COURT: I'll just tell you, I'm really not putting a lot of emphasis on --

MS. BUCKLEY: Okay.

THE COURT: -- all the things about additional issues that go on. I want you to address them, if you'd like to. I'll tell you, I'm most concerned about what happened here.

MS. BUCKLEY: I appreciate that.

THE COURT: That she takes somebody else's identity, that she gives -- that she basically is part of a fraudulent billing scheme against Medicaid for hundreds of thousands of dollars that she's earning quite a bit of money herself doing that, that as a result because she lacks the board certified training children who are very vulnerable are getting deprived of the treatment that they

should be getting, that's really -- I have to say that's really my focus.

MS. BUCKLEY: I understand that. I guess, you know, coming from a defense perspective, because all of this other information is out there, really what I just wanted to point out is I can appreciate the GAL's frustration, the GAL doing what she did to a degree on the federal side of things in terms of reporting. But as I said, it's just everything surrounding Ms. Stuart is chaotic. Dealing with her professionally is difficult at times because there's so much minutia, there's so much -- there's a lot of damage that she's suffered, there's damage she's inflicted, there's damage she feels she's suffering now from other people. And it is -- I truly see it as a mental illness that has probably many different labels, and I think it impacted her conduct here at a level where she made it her reality. And it was a terrible thing to do. And there was no question it was a terrible thing to do.

I think now where she's removed from it, she's in therapy with a clinical psychologist at last, someone who, in my opinion, of the people she's treated with before -- and I've communicated with prior individuals she's treated with who are legitimately what they say they are. I'll be frank, and this isn't Ms. Stuart's fault, I

haven't been impressed and I've been concerned that she wasn't receiving -- in the past she hasn't received proper treatment. The individual who's written a letter most recently seems to be very available to Ms. Stuart and it appears Ms. Stuart is at least turning a corner in understanding the gravity of what she did. I think sort of an easy fallback for her at times is the idea of I know what I did was wrong, but I cared about those kids. I know what I did was wrong, but I did my best. You know, I didn't mean to harm anyone. I think stepping back and seeing now that that's not good enough, that the possibility of these children losing out on services by someone who is qualified and certified, you know, to give them the services is the harm here, is one of the harms in addition to the immeasurable harm to JS. She gets it. She does get it now. The question is what is to be done with Ms. Stuart.

We've asked for a downward variance. I know it's a big ask in this case, but I truly believe her mental health issues have to be dealt with in the community on supervision with mandated evaluation that is a more in-depth evaluation than I think is often ordered under the conditions of supervision where she is mandated. And I believe this has to happen whatever Your Honor decides today. Ms. Stuart knows that I'm going to say

this. No matter what Your Honor orders today, for her to stop this cycle of, you know, living outside of reality and leaving people in her wake who are, you know, on Zoom today unhappy, at some level there's some level of involvement that she's just got to stop. She's got to clean up her life and she's got to earn that persona that she had previously, you know, taken from someone else. And that means major mental health treatment on supervision.

But I guess the other point that I made in the memo, this is someone who, yes, she's got charges against her. Now she has convictions from just a few years ago. It seems like while we have evidence from the government of things that have happened throughout her life that, you know, from the government's point of view and perhaps Probation's and maybe the Court's, this pattern of dishonesty, the real sort of falling apart has happened in these last several years where she's had more entanglements with the law. She has yet to serve a term of incarceration for any prior conviction.

And I certainly can understand and appreciate the government's argument that, you know, she has some problems since she's been on supervision. But in a position she's in where she's never served a term of incarceration and if she were put on federal probation, I

think she would be sufficiently, for lack of a better word, you know, scared to violate any conditions and end up reoffending.

Probation, as we've talked about or supervised release, in this case we're talking about probation and I've referred to it in the memorandum, it's not a sentence without some teeth. And I gave an example of a case where an individual basically got a walk but that went out and violated and the top of the guidelines came down on him for a couple of -- I think what we would say is relatively light violations. Her conduct can be controlled to a degree or at least somewhat, you know, limited by conditions of probation. The mental health piece can be addressed by probation. And certainly if she makes any -- I want to say one wrong move and then I'll regret that I said it like that. Your Honor I think knows what I'm referring to. Any sort of violation she'd be back in front of Your Honor with the possibility of a statutory maximum sentence.

And again, I know it's a big ask in a case like this where there are victims you've heard from and there are victims you haven't heard from. You know, you haven't heard from the families. I don't know why you haven't heard from the families. I'm certain that they've been reached out to. I know the government does its job and

does its job well. But I think she deserves a chance. And I think she deserves a chance to be in the community getting the mental health treatment. I don't know that she's going to get it at the Bureau of Prisons. I have concerns about that.

And to the degree that some might view probation as a slap on the wrist that doesn't do enough to promote respect for the law or, you know, demonstrate the gravity of her offense, as described in the memo, I think there's a lot hanging over her head that does make probation a significant sentence that does promote respect for the law. When you consider that in combination with the mental health issues and her history of horrific childhood abuse and trauma, at this point the chaos just needs to stop. She needs treatment. If she's not willing to abide by that treatment, then she's going to be back here facing a significant amount of time.

Your Honor, she wrote a letter that we submitted. And I think if she is able to, I would like her to address the Court just briefly.

THE COURT: Sure. I have just one question for you.

You talk a bit about how there's a correlation between trauma and trauma as a child is permanent, it scars somebody, it's not something that people just get

over. And I'm trying to figure out what kind of causal connection to draw, if any, between the trauma that she's experienced and the indications of mental health problems and the kind of criminal conduct that's occurred here.

So I can think -- I see lots of drug cases, of course. In the drug cases you see somebody who has experienced trauma and they effectively self-medicate. How do they self-medicate? Well, they sell drugs to do that. There's a clearer causal connection.

I'm trying to get from the kind of trauma that's detailed in the Presentence Report and then ultimately pretending to be the victim here by initials of JS, the same initials but different name, or even I think it's undisputed because I think she appeared on a Zoom conversation with a probation officer with a title of using actually a doctor's name, not just a behavioral analyst's name. So I'm trying to see what's the causal connection between the kind of trauma or mental health issues and that sort of very, very deep dishonesty that results in somebody impersonating somebody so that they can earn really quite a large salary. Why do you think that is?

MS. BUCKLEY: And again, taking into account my lack of -- taking into account that I'm not Dr. Baronoski, Your Honor --

THE COURT: I got that.

MS. BUCKLEY: Again, having hopefully learned a little bit from Dr. Baronoski.

Ms. Stuart was raised in an environment where her value was pretty much nothing. Her mother, there's some reference in the PSR and even in our brief to chaos -- not chaos, I'm using that word too much -- not a great relationship between her mother and the mother's maternal grandparents and issues where the maternal grandfather had where he, you know, would argue quite a bit with the mother, but also -- and again, I'm going to try to be careful about what I say here. But that whole scenario I think just I would imagine would rip self-worth from anyone. And that, I think, your self-worth would be completely, you know, nonexistent probably even before you got to the really egregious abuse that we talked about, some of the other things that she described that happened in her childhood.

So, you know, again, it's a tough thing to describe when you don't have the proper, you know, psychology or psychiatric words to do that. But I think the persona of a child who is growing into adulthood is almost non-existence at that point because they've never had any nurturing, they've been abused, they've been traumatized. And the only thing that works to sort of

survive at some level is manipulation or creating something of being something you're not.

If you take as true, as I do, what's reported in the PSR and what we've reported in our memorandum, and then you think about a child going to school with that weight on their shoulders knowing what they're coming from, the shame, the embarrassment. I don't think it's a shock that we have movies like *Sybil* -- and I'm not saying she's a multiple personality. That's sort of a background.

And these are legitimate -- I mean, the movie is dramatized. We've seen these things without Dr. Baronoski writing a report here, these are things to cause personality splinter. So I don't think it's a surprise that there's this sort of creating a life, creating a normalcy, making yourself appear better than you are because you don't think you're anything, because you've been treated like you're nothing and worse.

So, you know, does it excuse what she did? Absolutely not. There are plenty of people who have horrible backgrounds. Your Honor has sentenced some of them and they weren't necessarily liars, but they were drug addicts. Did she lie? Does it make her a liar? I know it's a harsh word. Yes, she did. But there is a huge mitigating factor here that created her mental health

issues that led to this behavior. Is it a direct connection? I'm not asking for a downward departure. I don't think I can meet that standard. I don't think I asked for a downward departure. I believe I argued it in terms of a variance, that that background provides mitigation because it's not a stretch to see someone creating this life for themselves in order to survive and not completely have a breakdown, a nervous breakdown or a psychiatric breakdown.

The other thing that I think sort of is interesting and not in a good way about her life is that she seems to -- it's almost like a flare. You think of people with chronic illnesses, they have flares when stress hits them, you hear about these things. I sort of see that with Ms. Stuart where there's trouble, there's chaos, there's problems. You see it with the divorce and you see sort of a fallout there. Then more recently there's chaos with the boyfriend. I think she doesn't manage stress and chaos and I think her interpersonal relationships, I don't know that they're built on solid foundation. So when there are problems, I think she resorts back to what she learned as a child.

And something that's sort of interesting and, you know, I suppose how you take it is -- you know, could be good or bad for Ms. Stuart. She self-reported to

Probation Officer Kilroy and to me about something she did to get a car. If you recall in the police report or how she got a car -- I'm sorry, not the police report, the PSR. And it was arguably manipulative. But when you know what it's tied to, it was if I do this, I might get something good. But it comes from that traumatic background. It comes from being told and being treated like you're nothing, like you're unwanted, and then someone going beyond just that and creating a harm that I couldn't even imagine.

And so I guess if we doubt all that, which the government and Your Honor and Probation, everyone in this room is entitled to do that, then I guess my argument really doesn't have legs to stand on.

THE COURT: One of the other -- at page 7 of your sentencing memo, you talk about, again, focusing now on the offense conduct here, offense of conviction conduct, how her conduct where she was receiving a substantial salary for I believe the 15-month period that she was working with Helping Hands, you frame it as allowing her access to a career in which she aspired and to the financial stability that she believed necessary to regain custody of her children. And I think the government's response is, well, based upon how she expended the monies that she received, it doesn't show

efforts to regain custody of her children such as hiring a new attorney to do that. Do you have a response to that?

MS. BUCKLEY: I do --

THE COURT: What conclusion should I draw about that?

MS. BUCKLEY: I do to a degree. I just want to ask my client if it's all right if I reveal something she mentioned to me.

THE COURT: Of course.

(Pause.)

MS. BUCKLEY: And when the government pointed that out, it was a good point. I addressed it with my client. I said that's a good point. You -- part of this, you know, idea was that you were going to be the stable parent.

I don't think that that argument was completely obliterated by the fact that she didn't hire an attorney. What she had said to me was -- and it's corroborated, I think it's corroborated by the guardian ad litem. She was spending money on her children and I think her idea, and it's sort of a distorted idea of stability, was sort of winning them over, buying them gifts, and being that parent who the kids wanted to be with.

She should have hired an attorney and she should have done probably more responsible things to establish

stability. But I don't think in her mind her motivation was different than what we've described. She should have used it for appropriate means to I hate to say fight, but at least meet her husband's allegations and, frankly, have counsel on a whole lot of things in her life.

THE COURT: Thank you.

Ms. Stuart, would you like to tell me anything?

THE DEFENDANT: Um, I -- there's no words of I'm sorry that can ever, ever take any of this away. I am ashamed, to say the least. But I don't want this to define who I am.

I am honestly praying for a second chance to not only be a productive member of society but, more importantly, the best mom that I can be. I have three children who I love more than anything in this world. And I just want to show them the right things in life. And the only way that I can do that is to address the mental health issues that I have. And I'm trying. Beyond words trying.

Obviously there's no question I didn't have the best growing up. But that doesn't excuse what I did. And the fact that I could have harmed other children is just awful. I wouldn't want it done to my children. And I did it to theirs. And I'm sorry. Beyond words sorry.

THE COURT: So I'm trying to figure out a bit

what your thinking was back at the time that you were dealing with these children who were on the autism spectrum disorder. I'm sure you know that they were vulnerable kids, right?

THE DEFENDANT: Yes.

THE COURT: And you know that you didn't have the training to perform the therapies.

THE DEFENDANT: I do.

THE COURT: Right. So when you were receiving a pretty good salary and you knew that your time was getting billed for this, your letter talks about, the letter that you wrote, it says, in part, that you were appalled and ashamed at the mere thought that you may have harmed the children in any way. And it says "I can honestly say that was not something that was intentional. I have always wanted nothing but the absolute best for those families."

So I am struggling a little bit with understanding how you could not have known at the time when you have children and you're billing for these services that are basically fraudulent because you don't have the training and you're doing it under an assumed name, and you're dealing with kids, and you being a mom yourself and you knowing how precious the developmental years are and how if you don't do something at certain points in times in kids' lives, it affects them later on,

frankly, your own biography being a bit in a way related to that. So how is it not apparent or, in other words, why should I think it wasn't intentional in terms of your knowing that the kids who have autism are going to be hurt by this? I understand you don't want to hurt them, but that's not your goal, some sort of sadistic desire to hurt children with autism. But it strikes me you had to have known that you were hurting them for your own monetary benefit by pretending to give them essentially services of the type, the quality that they were not actually receiving. So can you help me understand what was your thinking then?

THE DEFENDANT: Initially, Your Honor, when I had spoke to my previous owner --

MS. BUCKLEY: Your Honor, I feel like I do this with Your Honor quite a bit. Do you mind if I just ask her what she's going to say because I don't --

THE COURT: Of course.

(Pause.)

THE DEFENDANT: Can you just rephrase that? Can you just ask that --

THE COURT: Sure. Let me just make clear if somebody is not comfortable answering a question I have, that's no problem. I'm not requiring anybody, Ms. Stuart, to answer any questions that I have. Ordinarily,

especially if a defendant speaks to me or writes a letter to me, I sometimes have questions and I ask them if they wish to answer.

So in your letter you wrote that you were not acting intentionally. And I get that. That's kind of a legal term, right, "intentionally," in some ways. But you say you can honestly say that that was not something that was intentional, and you're referring to the harm to the children.

So my question is, it strikes me that you had to have known at the time that you're purportedly giving these services under a false name for children who are in their developmental phase, who are vulnerable, that you'd be hurting them. So that's why I'm trying to figure out what's going through your mind. How is it that at the time you think somehow you're not hurting them by depriving them of this treatment, necessary treatment?

THE DEFENDANT: Honestly, my vision was -- of what distortion was was -- I was completed distorted. I had motivation, obviously: my own kids. My kids had been ripped away from me. The only thing I ever wanted was my kids. And when everything happened in court, I did, I felt pressed up against a wall. My kids supposedly not wanting to spend time with me, which I didn't think was true and I know wasn't true. And wanting so badly to just

be able to be with them and help them in ways that I wasn't helped.

And even though I didn't have my credentials, I thought I had looked on to somebody that did have proper credentials, which they don't, and I just -- the only words are it was completely distorted. I have no other, no other explanation, Your Honor.

THE COURT: Okay. Thank you very much.

Is there anything else you'd like me to know?

THE DEFENDANT: I just want to thank you for hearing the case and hoping for a better future that I hope to have.

THE COURT: Thank you very much.

THE DEFENDANT: Thank you.

MS. BUCKLEY: Thank you, Your Honor.

THE COURT: All right.

Mr. Huang.

MR. HUANG: Thank you, Your Honor.

I don't think that there's any disagreement between the parties about the severity of the offenses that brings us before Your Honor today.

And I think while we haven't explicitly discussed it so far, certainly the number and the severity of the harm is quite pronounced in this case. Your Honor is aware of the letters that the victims of the charged

crimes from both Medicaid as well as from JS, they submitted letters to the Court, and they described in their own ways the nonmonetary harm that they individually suffered as an organization and as an individual based on what Ms. Stuart has done.

But of course, as Your Honor has alluded to, Ms. Stuart's conduct had a significant impact on the families who received her bogus services while she posed as a BCBA. And this is not some sort of opportunistic crime that occurred over a span of a couple of weeks, this was something that took quite a bit of concerted effort and focus because Ms. Stuart had to consistently play someone that she knew that she was not over a 15-month period.

It goes without saying that there is quite a bit of irony in terms of what Ms. Stuart is arguing to Your Honor today. Because on the one hand while she has focused, and understandably so, on the trauma of her own life and her own experiences to the Court, I don't think there's been enough discussion from her about the trauma, albeit obviously a very different trauma, that what her conduct did to the children of these families in this case. So I think there's a little bit of a disconnect between what Ms. Stuart is arguing to the Court about her own life and how it's impacted her, but I think no real

acknowledgment even in her letter, even in her words in terms of what she did to these families. These were children who were on the autism -- had autism disorder and they were in ages from five to teenagers. And these are the kind of services that I think, as we pointed out in our Presentence Report, these were oftentimes intensive interventions and treatments with these families.

Now, given Ms. Stuart's fraudulent sort of supervisory position that she assumed, she wasn't necessarily in the home with these families for all these hours. But a real BCBA would have supervised technicians who were in the home with these children and they were there sometimes multiple hours a day, multiple days a week. So this is not like a weekly therapy session, this is not some sort of monthly check-in. This is something that was critical to these families.

Attorney Buckley --

THE COURT: So just to be clear in terms of what's happening in her supervisory role, there are technicians qualified who are doing the services?

MR. HUANG: Yes, Your Honor.

THE COURT: So are the children actually missing out on services?

MR. HUANG: Well, the technicians have to implement a plan that is being monitored and written and

supervised by a legitimate BCBA. So we don't have indications that the technicians that Ms. Stuart supervised were not otherwise trained or qualified to provide those services, but they were being supervised by someone who wasn't qualified to supervise or implement a plan.

THE COURT: So the harm is essentially not altogether that the children weren't receiving the services, but that they weren't receiving services that were subject to proper supervision and direction.

MR. HUANG: Correct, Your Honor.

Now, there's also instances where Ms. Stuart was supposed to, especially during the pandemic, actually interface directly with the families. We don't have an incredible amount of detail when that happened, how that happened, it wasn't as if they never met her. She was supposed to be supervising technicians that were in the home with these families and working with them.

THE COURT: Okay. I think in the second addendum there's a letter I think from -- it's from Ms. O'Neill.

MR. HUANG: Okay. Yes, Your Honor.

THE COURT: I'm sorry, I misspoke. It's from Ms. -- I don't know if it's okay to use the name on the public record. The initials are KC.

MR. HUANG: Yes, I'm aware of that individual.

THE COURT: And it's a letter that talks about her assuming two cases in which Ms. Stuart had been the previous clinician.

MR. HUANG: Correct.

THE COURT: And she states how her immediate concern was the lack of care provided to the children. No evidence of skill acquisition programming based on clinical assessment, behavior reduction goals, data collection or ethical boundaries in place between the behavior technician and family.

MR. HUANG: Correct, Your Honor.

THE COURT: And no evidence, she goes on to say, that behavioral technician supervision had taken place.

MR. HUANG: I'm sorry, that last part again?

THE COURT: That no BT supervision had taken place. That's the next two lines of her letter, see that?

MR. HUANG: Yes.

I don't know exactly what supervision, if any, Ms. Stuart provided to the technicians. I have no reason to doubt what KC is saying is true in that letter.

THE COURT: Okay.

MR. HUANG: But I'm telling the Court what was supposed to happen when there's a real BCBA doing legitimate ABA work.

But I think the point is that there is this tension between her asking the Court to give mitigation consideration for the trauma that she has allegedly suffered in her own life without I think fully grasping the conduct that she did to these families. Of course, these are families who are facing really difficult circumstances, right? You have children who have these very important and critical needs. And you also have families who, because of their medical cost or because of other life circumstances, they're on Medicaid. And so I think there's another irony, Your Honor, between Ms. Stuart talking about the stressors in her life and how that may have affected or impacted her conduct in this case and yet also not fully recognizing the stress and chaos in these families' lives in dealing with children who have real needs and deserve real treatment and what sort of role she played in setting those families back from getting the help they deserve and that they need.

Your Honor, one thing that I did also want to focus on was that idea of the motive for here. And certainly we have no reason to believe that Ms. Stuart wasn't motivated in part because of her love of her children and wanting to spend more time with them and to be a better parent or perceived as a better parent from her children, but this is not a situation where Ms. Stuart

had this ulterior altruistic motive to help these kids even though she wasn't qualified to provide services to these children. It's not as if she assumed the identity of a BCBA in order so that she can provide pro bono services for these families or work with a nonprofit to work with these children who have these sort needs. She did this to make money. She made a lot of money, $146,000 in a 15-month period which for her was a lot of money. And Your Honor has already talked about the fact that she didn't spend the money apparently to hire a lawyer in regards to her child custody dispute with her ex-husband.

But the other important thing, Your Honor, to consider, it does not appear that she used to money to get effective mental health treatment either. And I think it's really important that the record indicates, at least through the letter from the GAL, that in the custody dispute a family court judge had told Ms. Stuart that the primary reason that he was awarding primary custody to her ex-husband was because Ms. Stuart did not have adequate or effective mental health treatment. And that was several years ago. And that is -- I think when a judge tells a party, a litigant, whether a defendant or a party, that this is happening because you don't have X or you're not getting treatment, it's coming at a critical and pivotal point in her life. And the fact that she had -- she

developed this scheme to defraud Medicaid and assume someone's identity, and she got all this money and she used it for whatever it is that she used that money for, the fact that she was not able, couldn't -- didn't get, couldn't find effective mental health treatment also says something I think about her and her circumstances.

One thing I did want to address, Your Honor, I think we have talked about this. Attorney Buckley indicated that she didn't submit a full report or evaluation. I know, from my discussions with her in this case, that is certainly an issue that she carefully considered in her experience appearing before this Court. So that's something she was obviously keenly aware of and certainly not shy to do in other cases. And certainly the government has every respect for her in her professional judgment in terms of whether or not to get and submit an evaluation of that sort.

But all of that is to say, Your Honor, that this is a crime that has real public safety concerns in terms of what Ms. Stuart did. This is not a securities fraud case. This is not a mortgage fraud case. This is a case that had real impact on these families and on these children as well as, of course, on Medicaid and JS as well.

I think if you look at the history and

circumstances, Your Honor, of Ms. Stuart, there are certain things that I think give the government great concern about whether she is likely to pose a risk of recidivism in the future. I think Your Honor has alluded to the fact that she appeared on the Zoom call as a doctor, Jennifer Stuart. Not only was a different first name but a different credential that she was not qualified to have and, of course, this is even after she appeared before Your Honor to plead guilty in this case.

There was an indication that the BACB, the credentialing institution who afford BCBAs and who submitted a letter to Your Honor in connection with this these, they had issued cease and desist letters to Ms. Stuart near the very beginning of this conduct. And Ms. Stuart ignored those cease and desist letters.

Mrs. Stuart's criminal history, the ones that resulted in convictions, also were around that time or shortly around that time. If someone has their first brush with the criminal justice system and gets a wake-up call I better do something with my life or this might not go well, that occurred before or the charges came before she engaged in the offenses in this case.

So I think there are indications in the record that gives the government concern about what would happen if Ms. Stuart were to get a probationary sentence, go back

out into the world, even if she were to get mental health treatment which she obviously needs, what is the risk to the public that she wouldn't try this again. It's very easy to steal someone's identify these days. It's very easy to pretend to be someone else. Given Ms. Stuart's history, we have concerns that she could easily do this again. And while the prospect or the sword of Damocles of additional jail time, even if that were to be detected and reported, I think the stakes are pretty high in terms of the harm that she could engage in. And I'm not sure that's a deterrent enough in a case like this because it seems like it wasn't a deterrent already notwithstanding the high stakes today.

So for all this, the government believes that a sentence at the top of the guidelines range is appropriate in this case. There is a need for specific deterrence for Ms. Stuart. That sentence would I think fairly account for her history and circumstances, the good and the bad. Primarily, Your Honor, it really speaks to the severity of the conduct which, again, I don't think there's any disagreement of. What she did here was very serious in terms of the harm that it caused. And we believe that under 3553(a) a sentence at the top of the range is necessary to satisfy all the goals that Your Honor must consider.

THE COURT: Thank you, Mr. Huang.

MR. HUANG: Thank you.

THE COURT: Ms. Buckley.

MS. BUCKLEY: Just a couple of points. And one of them I meant to mention it in my initial argument.

The Zoom name, obviously it's not a good thing to have "Dr. Stuart" on your Zoom when you're not a doctor. I, of course, have addressed it with my client. I confess, I didn't even notice it, but I think I've become sort of Zoom, I don't know, maybe just not as aware as I should be. But you know --

THE COURT: But it sounds like this was, at least by Mr. Tung's account in his letter, he says he was told that she was a doctor, if I'm remembering that correctly.

MS. BUCKLEY: I'm not disputing there was some representation at some point. I just want to make the point that, you know, it's not something she purposely was doing now. She didn't correct it is my understanding.

I guess, you know, when the government mentions the fact that she never got the mental health treatment, and maybe they didn't go quite that far, but she didn't get what she was supposed to get per the family court order, a couple things. I alluded to it a little bit earlier, and I know some of my attachment in my reply memo

allude to it, particularly the GAL email. Ms. Stuart did seek treatment from a woman who is a therapist and was a school guidance counselor and legitimately had some initials after her name. And, you know, it's my understanding that neither the GAL nor the Court deemed that person to be at the level required or at least doing the dialectical behavior therapy. And again, I'm sort of testifying here. I have been going back and forth with this person -- I can happily show it to the government at some point if they want to see it -- about a letter. And I've got to be frank with you. While I don't necessarily agree with terminology that was used, there's difficulty, I have to sometimes decide where it's best to spend my time and assuring someone that something will be under seal or dealing with worries about insurance coverage should there be some kind of a claim made for writing a letter, at a certain point I can't. You know, I have to cut my losses and go with what I've got. But I can at least represent to the Court that this individual stated that she did treat Ms. Stuart over the course of years sometimes when more need was necessary, when there was greater need, and sometimes lesser need. And you know, that's -- it's sort of neither here nor there really with what I'm going to say next is, it's not a shock when someone who really needs mental health treatment doesn't

get it because they don't always understand the degree to which they need it, which is why we have mental health issues in this nation in the world. People go off medication. People don't -- they don't want to face how great their problems are. And, you know, at some level we can attribute responsibility. I guess it just depends on how sort of aware they are. And I'm not taking responsibility away from her for not getting exactly what it was that she needed. But it's my understanding at the time she had limited transportation and this individual from whom she was getting treatment was willing to come to her.

Again, Your Honor, it's another path that we could traverse down. I'll spare you all of the details. But she didn't just flat-out not seek treatment. It wasn't necessarily what was required, and that's why I've stressed very much that any treatment she gets after today through Probation, whenever that may be, has to be, you know, mandated. And she's got to really follow the rules because she's not going to get very far without serious treatment from people qualified to give it.

THE COURT: Thank you.

So I'm going to take about a five-minute recess to consider all that I've heard and then return to impose sentence. Thank you.

(Whereupon, a recess followed.)

THE COURT: Please be seated.

Ms. Stuart, I'm going to turn to sentencing at this point in time. I want to talk to you a bit about what I've considered before I tell you what sentence I've decided is appropriate here.

Whenever I impose sentence in a case, I have to think about, of course, many things. I do have to think about what it is you did wrong that brings you into court, certainly what has been satisfactorily established in terms of prior conviction history. I also have to think about everything else in your life. And you've certainly had a complicated life, I realize that. The challenges, the successes that you've had, all of that, family connections.

I have to think about all that I know about you in light of what are those purposes of sentencing that you've heard the attorneys talk a bit about. Those purposes do include what's a just punishment in terms of what reflects the seriousness of the kinds of crimes that you decided to engage in here. I have to think about promoting respect for the law. I also have to, apart from that, think about what will tend to discourage or deter you from going back and making these kinds of choices of any kind to break the law generally. I have to think

about deterring others as well. I think about that to a lesser extent. I'm more concerned about you. I also have to think about rehabilitation in terms of what I can do, the sentence can do to help you set things right in your life so that you're not making these kinds of choices again.

Of course, I have to consider what the Sentencing Guidelines suggest and what they recommend. I'm not bound by them, but I do have to consider them. And I have to consider making sure that whatever sentence that I might impose in your case is not different, at least without a good reason, from a sentence that somebody in similar circumstances would receive.

So basically I think my role is to try to decide on a sentence that's fair and just and reasonable but also one that's not greater than necessary to serve these purposes of sentencing that we talked about today.

I tried to do that in your case. And I think you've heard some of the concerns, what I'll call the not-so-good side of things. I think you decided for quite a period of time, for more than a year, to really get involved in something for money, it's greed in a way, to engage in what amounted to fraudulent conduct here to pose as somebody who you weren't with skills and the certifications certainly that you didn't have. And you

ended up -- of course, what you did wrong ended up in fraudulent Medicaid expenditures of more than $300,000. And it also resulted in you earning a lot of money, approximately $146,000. So there's that. That's a concern for me, the length of time that that happens.

There are, unfortunately, other aggravating factors. Of course, there's the harm to the woman whose initials are JS, the name that you misappropriated of hers. She's written to me, importantly, about that harm. And I've taken that into account.

There's also, in my view, certainly a harm to the children here. And I don't have detailed recitations from the families in terms of that harm, although I'm not sure how to quantify exactly that harm and especially in relation to your role in a supervisory capacity, but I think I, on balance, share and am persuaded by the concerns that one of the letter writers by the initials of KC states there.

There seems to be a fundamental dishonesty, that's my concern with you. And something as severe as actually impersonating somebody or not, whether it's this other therapist or whether it's a doctor. And that raises real concerns for me in terms of how deep the inclination to do criminal things can be with you. And I'm persuaded in large part also by Mr. Huang's points about you

receiving a cease and desist letter I think in May of 2019 that's talked about, the government's memorandum, and in a letter I've already received here. That didn't stop you. And then your prior involvement in the criminal justice system I think described especially in Paragraph 57 of the Presentence Report concerning your involvement with an arrest from May 24 of 2019 involving your work with an elderly woman whose money, 89-year-old woman whose money -- you were supposed to be walking her dog and you gained access to her monies and misappropriated monies there that led ultimately to your conviction and sentencing this year for forgery in the third degree and larceny.

So to me it's a bit of a pattern, I have to say. It seems to me, whether it's an elderly woman or whether it's the welfare of vulnerable children, that you've let your own self-interest come first, whether you think you're somehow serving the interests of your children itself, you of course have no right to place the interests of your children above those of other children for whom you're being paid to provide services.

So I think those are the biggest concerns that I have of what I see here.

I see points on the other side. I do think that you had certainly a childhood that was traumatic. I'm not

going into the details, I understand that in terms of what's recited in the Presentence Report. I think you do have, it's fair to say, mental health challenges that result from this kind of trauma. I think that Ms. Buckley puts it well in terms of a low self-esteem. And I am hopeful in terms of I see that you're -- I think you're trying to acknowledge that now. I know that you're involved with the regular meeting with the counselor as well, and I have the letter from the counselor. I know that you've written to me as well talking about your sense of shame for what it is that you did here. I've also taken into account that.

On balance, I'm more persuaded by the government's view of what sentence I should impose. I can see the reasons that you're arguing why I should not impose a sentence of imprisonment. I can't see that that would be right. Not in light of the fact that your prior cases that you continued to do the crime even after being arrested in prior cases, not considering really the severity of what you did here. I don't see it as something that's aberrational in some way or -- and I'm not persuaded that it's wholly explained by the trauma, the issues that you've had in the past in terms of your background.

So that's why, in my view, a sentence of

imprisonment is an appropriate sentence. And it's appropriate in part because of what's a just punishment in terms of the purpose of the law to punish. It's also in part, I think, to hopefully possibly deter you from thinking I could ever do this again and not face this kind of sanction. So that's really my concern here. And this is why I'm going to impose a sentence of imprisonment here that's within the range that's recommended under the Sentencing Guidelines. So -- and I've taken into account all the arguments for why I should vary downward; I'm just not persuaded by them.

I'm going to ask Ms. Stuart to stand, if you could.

Ms. Jessica Stuart, for the reasons I've stated, I'm sentencing you to a term of 27 months of imprisonment. And that's within the Sentencing Guidelines range. And I will sentence you to 27 months on each of the two counts and they'll be concurrent to one another. I am imposing a term of supervised release with all the conditions we discussed.

Ms. Buckley, do you want me to read those out loud, those conditions, the mandatory, standard, and special conditions?

MS. BUCKLEY: Your Honor does not need to read them out loud. Thank you.

THE COURT: You'd waive that.

Except I'm not imposing the search condition.

MS. BUCKLEY: Thank you.

THE COURT: The term of supervised release will be three years for each count, but of course that's, by law, concurrent.

I'm not imposing a criminal fine.

I am imposing a restitution amount in the amount of $339,561.41. It's subject to the payment schedule that's set forth in the conditions, the supervised release conditions. I'm waiving payment of restitution during the term of imprisonment here. I don't think that there's the ability to pay during the term of imprisonment.

I wonder, Mr. Huang, if you could prepare a restitution order that reflects that.

MR. HUANG: Yes, Your Honor.

THE COURT: And then I will impose the $200 special assessment that's required.

I think that's it in terms of the sentence. Have I covered everything that I need to do?

THE PROBATION OFFICER: Your Honor, if you wanted to address for the restitution interest waived, if the Court wanted to.

THE COURT: Yes, I'll waive the interest on the restitution. It would be the dollar amount that I

reflected.

And so I'll just ask counsel, is there any reason why the Court cannot lawfully impose the sentence I just imposed apart from whether you agree it?

MR. HUANG: Two housekeeping matters.

With respect to the occupational restriction which I believe there's no objection, but I think for the record if you could make the finding under 5F1.5 that the restriction is reasonably necessary to protect the public because of Ms. Stuart's conduct.

THE COURT: I very much do. Thank you. I'll make that express finding. Thank you for that.

MR. HUANG: Thank you, Your Honor.

And then Your Honor may have mentioned it, did you impose the special assessment?

THE COURT: I think so. $200 special assessment total.

MR. HUANG: Thank you, Your Honor.

THE COURT: Ms. Buckley, anything you want clarified or any reason why the Court cannot lawfully impose the sentence?

MS. BUCKLEY: No, not that I'm aware of.

THE COURT: The judgment of the Court will be prepared by the Clerk's Office in consultation with the Probation Office.

And I want to make sure, of course, Ms. Stuart, you're aware of your right to appeal the sentence or the conviction. It may be limited by the terms of your plea agreement. But if you wanted to file any kind of an appeal, you need to know it has to happen in the next 14 days or you lose the right to appeal. And if you needed counsel and you couldn't afford your own counsel for an appeal, you would have counsel appointed to represent you. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Is there an issue of voluntary surrender? Is there a request for voluntary surrender or designation?

MS. BUCKLEY: Yes, both.

First, we would ask for the women's camp at Danbury and that's closest to home so if she wants visitors, it will be easier for them to get to her.

Also we would ask for self surrender to the facility. Other than I think the two reports that we've received over the last few months, I'm not aware of any recent issues with Ms. Stuart, so we ask she be continued on the same conditions.

THE COURT: I see.

Mr. Huang.

MR. HUANG: No objection to that, Your Honor.

We're not aware of any recent compliance issues. We just ask for a usual self surrender date not too long.

THE COURT: Understood. It usually takes BOP about 30 days to do a designation.

I think I will enter an order for self surrender to whichever facility the Bureau of Prisons may designate, Ms. Stuart.

I will make the recommendation for the federal prison camp at Danbury absent objection. It's not binding upon the Bureau of Prisons, Ms. Stuart, but I can make the recommendation at the least.

And I will make the self surrender date I think six weeks from today. I think maybe December 3, which would be the week after Thanksgiving. Does that make sense?

MS. BUCKLEY: Yes. Thank you, Your Honor.

THE COURT: December 3 will be your surrender date, Ms. Stuart.

Anything else for the Court to take up?

MR. HUANG: Nothing from the government, Your Honor. Thank you.

MS. BUCKLEY: No, Your Honor. Thank you.

THE COURT: Thank you all. Stand in recess.

(Proceedings adjourned at 12:20 p.m.)

C E R T I F I C A T E

RE: UNITED STATES OF AMERICA v. JESSICA STUART
No. 3:21CR83(JAM)

I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 1 through 75 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/

DIANA HUNTINGTON, RDR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(860) 463-3180

# UNITED STATES DISTRICT COURT
## District of Connecticut

## JUDGMENT IN A CRIMINAL CASE

UNITED STATES OF AMERICA

V.

JESSICA STUART

Case No.: 3:21-cr-00083-JAM-1

USM No.: 48214-509

David Tien-Wei Huang, Assistant U.S. Attorney

Moira L. Buckley, Defendant's Attorney

Defendant pled guilty to guilty to Counts 1 and 2 of the Information.

Accordingly, the defendant is adjudicated guilty of the following offense:

| Title & Section | Nature of Offense | Offense Concluded | Count |
|---|---|---|---|
| Title 18, United States Code, §1347 | Health Care Fraud | September , 2020 | 1 |
| Title 18, United States Code, §1028(a)(7), (c)(3)(A) and (b)(1)(D) | Using False Identification in Connection with Another Crime | December 17, 2019 | 2 |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IMPRISONMENT**

Defendant is ordered committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total of 27 months on Count 1 and 27 months on Count 2 to be served concurrently.

The defendant shall self-surrender directly to the facility designated by the Federal Bureau of Prisons no later than 12:00 p.m. on December 3, 2021 by her own arrangement and at her own expense. In the event the defendant does not receive designation by the Bureau of Prisons prior to the surrender date, the defendant must self-surrender to the United States Marshals Service by 12:00 p.m. on December 3, 2021 in New Haven, Connecticut if no extension of time has been granted for self-surrender.

All conditions of bond remain in effect.

**SUPERVISED RELEASE**

Upon release from imprisonment, Defendant shall be on Supervised Release for a total term of 3 years.

The Mandatory and Standard Conditions of Supervised Release as attached are imposed. In addition, the following Special Conditions are imposed:

1. You must participate in an educational and/or vocational services program and follow the rules and regulations of that program. Such programs may include, but are not limited to, job readiness training and skills development.

2. You shall not seek or maintain employment in the field of applied behavior analysis without prior approval from the U.S. Probation Office.

3. You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The Probation Office may share financial information with the U.S. Attorney's Office.

4. You must pay any restitution that is imposed by this judgment in a lump sum immediately. If you are unable to pay the full balance in a lump sum, any remaining balance is payable at a rate of not less than $100 per month or 10% of your gross monthly income, whichever is greater. The monthly payment schedule may be adjusted based on your ability to pay as determined by the probation officer and approved by the Court.

5. You must participate in a program recommended by the Probation Office and approved by the Court for mental health treatment. You must follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.

6. You shall have no direct or indirect contact with Jessica Schleicher, nor use Jessica Schleicher's name and/or identifying information in any way.

7. You must participate in a program recommended by the Probation Office and approved by the Court for inpatient or outpatient substance abuse treatment and testing. You must follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.

**CRIMINAL MONETARY PENALTIES**
Defendant must pay the total criminal monetary penalties under the schedule of payments as follows:

| | |
|---|---|
| **Special Assessment:** | $200.00 to be paid to the Clerk of the Court |
| **Fine:** | Waived |
| **Restitution:** | $339,561.41 |

It is further ordered that the Defendant will notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are paid.

The following Counts as to Jessica Sturart have been dismissed: NA

**JUDICIAL RECOMMENDATION TO THE BUREAU OF PRISONS**
The Court recommends Defendant be designated to FCI Danbury Camp to maintain family relationships.

Date of Imposition of Sentence: October 15, 2021

__/s/__________________________________
Jeffrey A. Meyer, United States District Judge

Date: October 21, 2021

## CONDITIONS OF SUPERVISION

**In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:**

## MANDATORY CONDITIONS

1. You shall not commit another federal, state or local crime.
2. You shall not unlawfully possess a controlled substance.
3. You shall refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ■ You must make restitution in accordance with 18 U.S.C.§§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ■ You must cooperate in the collection of DNA as directed by the Bureau of Prisons or probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

## STANDARD CONDITIONS

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7. You must work full time (at least 30 hours per week) at a lawful type of employment unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision and impose a term of imprisonment, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) ______________________________ ______________
Defendant Date

______________________________ ______________
U.S. Probation Officer/Designated Witness Date

**CERTIFIED AS A TRUE COPY ON THIS DATE:** October ____ , 2021

By: ___________________________
Donna Barry, Deputy Clerk

**RETURN**

I have executed this judgment as follows:

Defendant delivered on _______________ to ______________________________ a ___________________________, with a certified copy of this judgment.

______________________________
Lawrence Bobnick
Acting United States Marshal

By ______________________________
Deputy Marshal

LOCAL PROB 12N
(06/22)

# UNITED STATES DISTRICT COURT
## for the
## District of Connecticut

## First Petition for Action Request for Compliance Review Hearing

Name of Offender: Jessica Stuart

Docket Number: 0205 3:21CR00083-001

Sentencing Judicial Officer: Honorable Jeffrey A. Meyer, U.S. District Judge

Date of Original Sentence: October 15, 2021

Original Offense: Count 1: Health Care Fraud, in violation of 18 U.S.C. § 1347
Count 2: Using False Identification in Connection with Count One, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A)

Original Sentence: 27 Months Bureau of Prisons; 36 Months Term of Supervised Release

Type of Supervision: Supervised Release    Date Supervision Commenced: December 1, 2023

AUSA: David Tien-Wei Huang    Defense Attorney: Kelly Barrett

---

**PETITIONING THE COURT TO ISSUE A SUMMONS FOR COMPLIANCE REVIEW HEARING**

**NONCOMPLIANCE SUMMARY**

The offender has not complied with the following condition(s) of supervision:

| Noncompliance | Nature of Noncompliance |
|---|---|
| Charge # 1<br>Standard #5 | You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.<br><br>On August 1, 2024, Ms. Stuart reported that she had found and applied for an apartment in Thompson, Connecticut. On August 6, 2024, she inquired with our office about helping her with first and last months rent to help her obtain the apartment. When the process was explained to her, she stated that she did not want the landlord to know about her federal case. She was going to look into other options and call back. The undersigned did not hear from her again. On August 13, 2024, the undersigned contacted Ms. Stuart who advised that she had already moved and had been living at the new address. Ms. Stuart did not advise the undersigned that she had moved or that she had obtained the financial means to do so. |

| | |
|---|---|
| Charge # 2<br>Special | You must pay any restitution that is imposed by this judgment in a lump sum immediately. If you are unable to pay the full balance in a lump sum, any remaining balance is payable at a rate of not less than $100 per month or 10% of your gross monthly income, whichever is greater. The monthly payment schedule may be adjusted based on your ability to pay as determined by the probation officer and approved by the Court.<br><br>Ms. Stuart failed to make payments in December 2023, January 2024, March 2024, May 2024, and June 2024. In July her total amount due was $900. This amount included missed payments totaling $500 and her monthly amount of $400. Ms. Stuart only made a partial payment of $500 and this is her last payment made to date. |

U.S. Probation Officer Action:
Ms. Stuart has had numerous incidents of noncomplaince with the conditions of release; specifically, with regards to being truthful with her Probation Officer and providing information as requested. In December 2023, she commenced supervision and was residing with her boyfriend at his mother's house. She was made aware of her conditions and stated she understood them. Her main focus was to gain employment and make payments toward her restitution.

In January 2024, the undersigned made contact with Ms. Stuart and requested an office visit. Ms. Stuart declined the visit, stating that she gained employment and was now working full time. The undersigned was unaware she was employed and when questioned further, she stated she had started that same day (January 16, 2024). However, when the undersigned asked for the first paycheck, it stated on that check that her start date was December 31, 2024.

In January 2024, Ms. Stuart was asked if she made her $100 restitution payment for the month of December and she said she had not, due to not having any income. She further explained that due to her recent employment she would make payments soon. Although she was provided with online payment information as well as instructions, no payments were made.

In February 2024, Ms. Stuart was reminded again about payments and financial paperwork that had not been received. She made a small payment based on her January paycheck; however, financial forms were not received until March 2024. In reviewing her financial statements in March, it revealed that Ms. Stuart and her boyfriend leased a 2024 Jeep Wrangler in December 2023 and she was financially responsible for making the monthly payments in the amount $822.01. Her bank statements revealed that her bank account was used for the automated monthly payments that were being debited from her account. When questioned, Ms. Stuart explained that this was the "cheapest" car she could get and her boyfriend leased it for her. Further she admitted to being financially responsible for the payments.

Ms. Stuart reported that she lost her job at the end of April and she did not find full time employment again until June 2024, when she was hired with a new company in Bristol, CT as an Assistant Manager for Bristol Adult Resource Center. Ms. Stuart was fully aware that she was behind on payments and needed to continue to make payments and complete updated financial forms due to new employment. She was reminded on multiple occasions and a partial payment was finally made in July 2024. Ms. Stuart continued to note that another payment would be made by the end of the month.

Ms. Stuart's living situation became problematic in mid July 2024 due to a domestic violence arrest that involved her boyfriend. He was arrested by the Bethel Police Department for Disorderly Conduct, and two separate charges for Violating Conditions of Release. According to the officers, an argument began between Ms. Stuart and her boyfriend, Travis LaPoint, while they were driving to a concert. Mr. LaPoint was drinking beer in the vehicle and Ms. Stuart did not want him to. The argument escalated and Mr. LaPoint hit her with the beer can in the chest causing multiple bruises to her upper chest area. Ms. Stuart contacted the police, he was arrested and a no contact order protective order was issued to protect Ms. Stuart. Mr. LaPoint violated that order twice in one night. The first time, he went back to the residence where Ms. Stuart was, and the second time he sent her text messages after he posted bond.

Initially, Ms. Staurt left Mr. LaPoint's home to stay with her sister. Mr. LaPoint's family reached out to the undersigned and advised that Ms. Stuart was no longer welcome in the home and needed to leave. They advised she could return one time to retrieve her belongings, but she was not allowed to stay there any longer. As such, this residence was no longer approved by probation. Ms. Stuart was notified and with the help of her sister she was able to stay in nearby hotels. She eventually found an apartment and inquired with the undersigned for housing assistance. Ms. Stuart was unwilling to utilize the probation office's assistance as she did not want her landlord to find out that she was on federal supervision. That was the last conversation the undersigned had with Ms. Stuart regarding her residence. Approximately a week later, the undersigned reached out to Ms. Stuart for an update and she noted that she had already moved and borrowed $2,300 from her sister (verified). Ms. Stuart feigned ignorance with resepct to her conditions of release which required communication with her Probation officer regarding things like residence and employment changes. Further, on August 14, 2024, the undersigned received verification that Ms. Stuart had paid her sister back in the full amount of $2,300. It is further noted that while Ms. Stuart was able to pay her sister back, she has not made restitution payments as required by her conditions of supervision.

Ms. Stuart has been employed full time and is able to make 10% of her gross monthly income. It appears Ms. Stuart is not making conditions of supervision a priority and willfully refuses to communicate honestly with the undersigned. She does not appear to fully grasp the seriousness of her conviction and resulting supervision.

U.S. Probation Officer Recommendations:

The Probation Office requests that the Court issue a summons for a compliance review hearing.

Respectfully Submitted:

[signature]

Lisa van Sambeck
U.S. Probation Officer

Date: August 28, 2024

**THE COURT ORDERS:**

☒ Issue a summons for a compliance review hearing Date: ____________

☐ Issue a summons for a violation hearing Date: ____________

☐ Issue a warrant for a violation hearing

☐ No action

☐ Other

/s/ Jeffrey A.
Judicial Officer

September 5, 2024
Date

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | Criminal No. 3:21-CR-00083 (JAM-1) |
| vs. | September 19, 2024 |
| JESSICA STUART, Defendant. | |
| | Federal Building<br>141 Church Street<br>New Haven, Connecticut |

COMPLIANCE REVIEW HEARING

(Transcription from Electronic Recording)

Held Before:

THE HON. MARIA E. GARCIA
United States Magistrate Judge

Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

APPEARANCES:

For the Plaintiff:

OFFICE OF THE UNITED STATES ATTORNEY
157 Church Street - 25th Floor
New Haven, Connecticut 06510
203-821-3700
david.huang@usdoj.gov
BY: DAVID TIEN-WEI HUANG, ESQ.
Assistant U.S. Attorney

For the Defendant:

FEDERAL PUBLIC DEFENDER'S OFFICE
265 Church Street - Suite 702
New Haven, Connecticut 06510
203-498-4200
kelly_barrett@fd.org
BY: KELLY M. BARRETT, ESQ.

(Proceedings commenced at 2:04 p.m.)

COURTROOM DEPUTY: All rise. The Honorable United States District Court is now open after recess. The Honorable Maria E. Garcia presiding.

THE COURT: Thank you. Just be seated.

All right. We're hear in the matter of United States vs. Jessica Stuart. It's case 21-cr-83 assigned to Judge Meyer. My name is Judge Garcia and we're here for a compliance review hearing. Could I start with the appearances. The Government can start.

MR. HUANG: Good afternoon, your Honor. Dave Huang on behalf of the Government.

THE COURT: Good afternoon, Attorney Huang.

MS. BARRETT: Kelly Barrett from the Federal Defender Office on behalf of Jessica Stuart who is with me at counsel table.

THE COURT: Good afternoon, Attorney Barrett. Good afternoon, Ms. Stuart.

If I could have the appearance of Probation as well.

OFFICER VAN SAMBECK: Lisa Van Sambeck for U.S. Probation.

THE COURT: Good afternoon, Officer Van Sambeck.

All right. You can be seated everyone.

So we are here because a petition for action request for compliance review hearing was filed by Probation and it was signed off by Judge Meyer, I believe it was on September 5th, 2024.

Ms. Stuart, the petition we're talking about is one that was filed with the Court on September 6 and I just want to make sure that you've seen this petition.

THE DEFENDANT: Yes.

THE COURT: Okay. And you've reviewed it with your attorney? Do you have it in front of you? I see your lawyer is putting something in front of you.

THE DEFENDANT: Yes.

THE COURT: All right. So what I'm going to start with is I'm just going to go through the petition so that we're all kind of clear what the concerns are that Probation is bringing before the Court and then we can kind of have a conversation about it.

So the first thing on the petition is that there is not compliance and that you have violated Standard Condition number 5. Standard Condition number 5 states that you must live at a place approved by Probation, and if you plan to change where you're going to live or anything about your living arrangements such as the people you're going to live with, you have to notify the Probation Officer at least 10 days before that change.

And that if notifying a Probation Officer in advance is not possible because of unanticipated circumstances, you're going to have to notify Probation within 72 hours of becoming aware of the change or the expected change.

So that's the condition that they're saying that you violated.

In terms of what it is that you did that specifically violated that condition, the petition says that on August 1st you reported that you had found and applied for an apartment on Thompson, Connecticut. That then on August 6th you inquired with Probation about Probation helping you with first and last months rent in order for you to obtain an apartment. And at that point the process was explained to you and that you stated to Probation that you didn't want the landlord to know about your federal case, and that you were going to look into other options and call back.

The Probation Office is saying that they didn't hear from you again and that then on August 13th Probation contacted you and that you told Probation that you had already moved and that you had been living at the new address.

And then the petition goes on to state that you, Ms. Stuart, did not let Probation know that you had moved on or that you had even obtained the financial means to do

so. So those are the allegations that support the first charge of noncompliance.

The second charge is that you violated a special condition, and the special condition that as imposed by Judge Meyer in this case, Ms. Stuart, is that you have to pay restitution, you must pay any restitution that is imposed by this judgment in a lump sum immediately. If you are unable to pay the full balance in a lump sum any remaining balance is payable at a rate of not less than $100 per month or 10 percent of your gross monthly income, whichever is greater, and that the monthly payment schedule may be adjusted on your ability to pay as determined by the Probation Officer and approved by the Court.

What the petition says is that you failed to make payments in December of 2023, in January of 2024, in March of 2024, in May of 2024 and in June of 2024. And then in July your total amount due was $900 and that this amount included missed payments totaling $500 and a monthly amount of $400, and that you made only a partial payment of $500 and this is your last payment made to date.

Now, so that's -- those are the two charges here in the petition. There's also some further information here about other numerous incidents of noncompliance. And

it details instances where Probation regards you as having been untruthful and you not providing information to Probation as has been requested by Probation.

The petition goes on to say that in December of 2023 when you began your supervision you were living with your boyfriend at his mother's house, that you were made aware of you conditions and that you say that you understood them. And then at that point your main focus was to gain employment and make payments toward your restitution. But that starting in January of 2024, just a month later, Probation made contact with you and requested an office visit, and that you, Ms. Stuart, declined a visit saying that you've been gainfully employed and working fulltime.

The petition goes on to say that Probation didn't know when you told them that that you were employed and that when you were asked further about it you said you had started that same day. And then when Probation asked you for the first paycheck that wasn't consistent with what you had told them because according to the paycheck the paycheck said that your start date had been December 31st, 2024.

There's some other details here about how in January of 2024 when you were asked if you could make your $100 restitution payment for the month of December you

said you didn't have any money. But that because you had gotten recently employed you would start to make payments soon, and that at that point you were given information on how to make online payments, but that no payments were made.

The petition then details that in February, the next month, you were reminded again by Probation about payments and about the financial paperwork that you hadn't completed, and at that point you made a small payment, however the financial forms weren't received until March of 2024.

Then there's some statements in here about how the financial statement that was submitted in March revealed that you and your boyfriend had leased a 2024 Jeep Wrangler back in the summer of 2023 and that you were financially responsible for making the monthly payments which were in the amount of $822.01 a month. And that your bank statements revealed that your bank account had been used for the automatic monthly payments that were being debited from your account. And that when you were asked about this you said that this was the cheapest car that you could get and that your boyfriend had leased it for you, but that you admitted to being financially responsible for the payments.

There's some other information here about you

losing your job and then getting another job in June of 2024. You were aware that you were behind on your payments, you were reminded on multiple occasions and that finally you made a partial payment in July of 2024.

Then there are some details here about a situation with your boyfriend that arose in mid-July of 2024 with domestic violence arrest of your boyfriend which led to you moving out of your boyfriend's home and you having a protective order against him.

There's also some information here, Ms. Stuart, about you borrowing money from your sister, about $2,300, in order to pay for housing and then paying her the full amount $2,300 even though you hadn't made your restitution payments as is required by your conditions of supervision.

So there's a lot more details here about the domestic violence incident but I don't think that that's really the focus of today's hearing. I think the focus of today's hearing is, Ms. Stuart -- well, it seems to me just an inability to understand that your conditions of release and your obligations to pay restitution and to be in communication with Probation about all of that have to be the priority.

So I want to ask Officer Van Sambeck, has there been like -- can you update the Court and the parties here in terms of like what has happened since this petition was

submitted? Because it's been a few weeks.

OFFICER VAN SAMBECK: Yes, Judge. As of Monday, I believe is it was Monday, Ms. Stuart emailed me a Pay.gov statement stating that she had paid her back payment of $500. So I don't believe that that's included in her total amount yet. I believe it's posted to -- because it through Pay.gov, but I did get the verification that she made that payment.

She also today has provided me with updated financial statements through her attorney as well as herself and that information I would still need to review as I just received it today.

She did provide paychecks and pay -- I guess you call it like timestamps for her clocks in and out. She provided that I believe a week ago --

THE COURT: Okay.

OFFICER VAN SAMBECK: -- to our office, so she was able to kind of give me back all the paychecks that I had been requesting that I had not received. That would probably be the up to date.

THE COURT: When did -- so you got the financial statement today from her lawyer. When did you last request the financial statement?

MS. BARRETT: I received on Tuesday of this week the financial statement that Ms. Sambeck wanted to be

completed. Prior to that Ms. Van Sambeck and I had spoken about the financial statement I think in August, and Ms. Van Sambeck said hold off because there's going to be a new form, so you might as well just have her complete the new form, which I received on Tuesday, provided to Ms. Stuart, and then she completed it by today.

THE COURT: Okay. Is it always the case that the financial statement is done through the attorney's office or is it something that's typically done between Probation and the person being supervised?

OFFICER VAN SAMBECK: When a person has counsel we usually do get involved. If the person doesn't have counsel I think they usually do it directly. It could go either way. If they'd like their attorney to be involved with it they certainly can. I have plenty of clients on supervision who fill them out on their own and send it back to me with all the supporting documentation their office has requested.

In Ms. Stuart's case she's probably in her best interest to do that with Ms. Barrett, Attorney Barrett.

THE COURT: It sounds like Probation has been going above and beyond trying to chase information that it shouldn't have to spend time chasing.

Attorney Huang, you're here today. You know, you don't have to be here for compliance review hearings,

but the fact that you're here makes me think there's something the Government might like to add or --

MR. HUANG: No, your Honor, I'm here in part because I was the original prosecutor and I know that your Honor is not necessarily familiar with the file --

THE COURT: Um-hum, I'm not.

MR. HUANG: -- because Judge Meyer handled the proceedings. So I'm here really just to provide any sort of background information from the original prosecution in case your Honor has any questions.

You know, I know very little in terms of the actual compliances. Obviously this is between Probation and Ms. Stuart.

THE COURT: Sure.

MR. HUANG: I will say just from the Government's perspective, you know, I remain concerned about the lack of apparent transparency and truthfulness by Ms. Stuart and it's -- that would be concerning in and of itself, right, just not compliance with the Court orders. But I think because underlying case involved identify theft, we had real victims. We are concerned that this is, you know, she's leading herself down the path to, you know, bigger problems and no one wants that.

THE COURT: Do you know what is the total amount of restitution that's still owed?

MR. HUANG: So I don't have an exact figure. I do have the judgment in front of me and so the restitution order that was entered was $339,561.

THE COURT: Okay.

MS. BARRETT: I know the amount, your Honor, because I've been in contact with the Clerk's Office and I received the latest restitution ledger which does not include the last $500 payment, but it's $337,912.41.

THE COURT: Okay. And is this a situation where the Government could or may eventually seek to garnish her wages --

MR. HUANG: Absolutely.

THE COURT: -- to get -- okay. That hasn't been done yet.

MR. HUANG: Has not been done, no.

THE COURT: Okay.

OFFICER VAN SAMBACK: To provide background on that our office had discussions with Ms. Stuart. She was not in agreement to a voluntary waiver to have the Government garnish the wages, so I did bring that back to the Financial Litigation Unit as she was not willing to do it voluntarily, and there's been discussions in the background as to whether or not they were going to go in and garnish her wages. They were going to -- we were going to have another conversation following this hearing.

THE COURT: All right.

Attorney Barrett, I'll hear from you. Thank you.

MS. BARRETT: Yes, your Honor. I would just say that Ms. Van Sambeck asked me to get involved with Ms. Stuart, which I did, and we've been working together to -- for Ms. Stuart to get into compliance. And as of now, understanding what has been alleged, she is now currently compliant on her restitution payments.

I checked with the Clerk's Office, I'm not basing this on Ms. Stuart's word. I have the ledger plus the $500 payment made on Monday so she now is up to date and still has to make a payment for the month of September.

We also provided updated financial statements with backup to the Probation Office so that has been accomplished, and with regard to -- as well as her detailed work paystubs which come from a pay system that you have to download the document and we provided those to Probation.

In terms of her living situation I do want to provide context to the Court that that situation arose out of the domestic violence incident where Ms. Stuart was forced to leave her home in a crisis. There were discussions between myself, Ms. Stuart and Ms. Van Sambeck

about where she would go. Ms. Stuart was given a liaison, a victim rights liaison. She did utilize those resources to the fullest extent. They were not able to provide housing for her. She did go to motels. There was a lot of that information communicated with Probation.

And I would just say like she was the victim of that situation and she was the protected party and she was the one that was forced to leave her home because someone else was the aggressor against her. And, you know, monetary issues aside, I mean that was a particular situation that arose to the housing situation that I think has now been addressed because Probation knows where she is living.

So my hope is that she's now come into compliance and my hope would be to work with her and Probation to stay that way.

THE COURT: How about this car that was leased and that she has, you know, significant -- I mean it's a lot of money a month. Is that still something that she owes?

MS. BARRETT: My understanding is that her ex-boyfriend has taken that vehicle back and that responsibility back. So I don't think so.

THE COURT: Is she planning on paying her September restitution when we have --

MS. BARRETT: Yes.

THE COURT: -- a couple of days before the month is over?

MS. BARRETT: Yes.

THE COURT: Is she planning on paying it --

MS. BARRETT: Yes.

THE COURT: -- this month?

MS. BARRETT: Yes.

THE COURT: And where is she working, and what is the nature of her job?

MS. BARRETT: She works as an assistant manager at the Bristol Adult Resource Center.

THE COURT: What does that entail?

MS. BARRETT: A variety of things that includes, it could include driving, includes overseeing other personnel. The population of people that are there are adults with disabilities.

THE COURT: How long -- and she started working there, was it in July of 2024?

MS. BARRETT: In June.

THE COURT: One of the things that Probation has raised with me and that's in the compliance review petition is an inability to visit Ms. Stuart at places of employment or even in her home to do the supervision that Probation deems necessary. So has there been any

discussions around Ms. Stuart understanding that's something that needs to happen and be facilitated?

MS. BARRETT: Certainly around visiting her in the home, yes, or coming into the office. It would be the death nell to come to the workplace and we avoid that at all costs.

THE COURT: But it's been mentioned that Probation has been trying to work with Ms. Stuart to be able to accommodate her schedule, but that it's been met a lot of resistance.

MS. BARRETT: Yes. We have discussed that and she understands that Probation needs to be able to visit with her. I mean part of the issue is she really is working a lot of hours and that's reflected in the paystub. And I know part of the issue was Probation and have the paystubs initially, so how could they verify that. But now they do, and she does work as much as she can to try to make the restitution payments now and that's how she's been able to catch up. So she's not always at home at the time that Probation wants to visit, but I do think that she understands that she needs to work with Probation.

THE COURT: I mean Probation is just trying to do their job, Ms. Stuart. You know, they're trying to make sure that you remain compliant and one of the reasons

they're doing that is so that you don't, you know -- this is just a petition, right? Nobody is revoking your lease, nothing is going to happen to you other than making some additional conditions being agreed to and submitted to Judge Meyer. But, you know, the way this works is this is kind of the first step, right, and so we have this compliance review hearing, we go through the issues and we hopefully get on a path where you don't have to come back because you understand what you need to do in order to be in compliance.

But if what happens is you're not in compliance, if you continue to not pay your restitution, to hide the ball from Probation, not provide financial statements in a timely fashion, you know, incur debts that are above and beyond maybe what you have the financial capacity to bear, not allowing, you know, not communicating with Probation allowing them to visit you. If those things continue then the situation starts to escalate and then we're not talking about a compliance review hearing. What could happen next is, you know, a petition for revocation of supervised release and all these other things. And nobody in this courtroom wants to see that happen.

But there's a lot of things that are within your control. I understand there's a lot of things are not within your control. I'm sorry to hear about some of the

things that you've been dealing with personally. But there are victims out there that are owed money, hundreds of thousand of dollars that you still owe and that you're going to spend a lot of time paying back. And the Government is not going to let this go.

And so you have to get organized and figure out what it is you're going to do to make your restitution payments and have the type of relationship with Probation that's going to allow you to fulfill your obligations and not land you back in court before me or before Judge Meyer.

Do you have any questions for the Court about what it is that you need to do in order to be in compliance with your conditions? You can ask me directly; you can ask me through your lawyer.

(Pause.)

THE DEFENDANT: No, no questions.

THE COURT: I just want to say when I see the information in the petition about you buying a car at a rate of over $800 a month, I can have a lot of compassion for people living paycheck to paycheck who cannot afford to buy the basics, food, electricity. And I also have a lot of compassion for needing a car to get to work and all of those things. People take public transportation, people take trains, people take Ubers. When I hear of

somebody -- see, you're not listening, you're just writing what you want to respond to, that's fine.

When I hear about somebody who's not paying even the minimum restitution of $100 a month on a timely basis, yet taking out lines of credit or buying something where they're going to have incur a liability of $800 a month, what that signals to me is that you just don't care. Really there's no other way for me to interpret that.

So we're here at a compliance review hearing. I hope you, I hope -- I mean you have tremendous counsel here who has gotten you up to speed in terms of giving Probation what you need, but we can't have a hearing every time you don't provide what you're supposed to provide. We can't have a hearing every time you're six months behind. That's not the way -- this isn't going to work that way. We're not here to babysit anybody.

And so either you get your affairs in order or there's just going to be a further escalation of this, and I want to repeat, nobody here wants to see that happen.

So I know Probation had some proposed conditions of release. I'm not in a position to impose any additional conditions of release, but if there are conditions of release that want to be discussed here today and either agreed to or not agreed to and submitted to Judge Meyer we can kind of have that conversation here.

MS. BARRETT: If I may, what I would propose is -- I received a list of conditions two hours ago and Ms. Stuart was at work, I wasn't able to discuss them, she came straight from work and is going back to work. I think it might be productive if we could possibly proceed by a 12b where I can review the conditions with Ms. Stuart. We could agree on the conditions, submit them via 12b to Judge Meyer and if there's any ones that are disputed we could have a hearing with Judge Meyer. But I think we can agree on most of them.

THE COURT: Okay. How does that sound to the Government and to Probation?

OFFICER VAN SAMBECK: I am fine with doing that. I do -- I think that there's two conditions that defense is going to have an issue with, and I think that Judge Meyer is going to have to make a final decision on that anyway.

THE COURT: Okay.

OFFICER AN SAMBECK: But I think the ones, during my initial conversation with Attorney Barrett, hopefully we can come to some kind of agreement on. I don't know if the Court wants to put them on the record what we're looking for, or if that's not your interest in it.

THE COURT: I mean I think -- look, additional

financial conditions that I'm aware Probation is seeking such as no additional lines of credit, you know, can't open any bank accounts, no expenses let's say over $500 with approval, these are all it would seem to me very appropriate and they would act as safeguards for you, Ms. Stuart, and making it very clear for you what it is that you do or, you know, should or shouldn't do. And I think all of those are appropriate.

I understand that are some other conditions that may be a little bit more controversial such as the third-party (indiscernible) condition and the no contact condition with respect to Travis LaPont (phonetic) and his family. I don't know that it serves any purpose to discuss those here since I don't have authority to impose them, but what I would say to you, Ms. Stuart, and to your lawyers, think through carefully these conditions and think about the fact that these are not things that are necessarily trying to limit you. These are thing that are probably trying to help you on a path towards compliance and avoiding, you know, violating federal, state and local laws.

So that's the intent of these things. And also the third-party risk is, you know, that's a condition regarding protection of the public which in my view seems appropriate, but that's going to be up to Judge Meyer if

you guys can't agree.

So thank you for providing those, Officer Van Sambeck, to Defendants. If you could have the conversation and submit whatever you wanted to submit to Judge Meyer through a 12b I think that would be the best way to go about it.

All right. Anything else?

MR. HUANG: The only request, your Honor, is that whatever proceedings need to happen with respect before your Honor or before Judge Meyer, these issues seem to have been going on for a while so I think the Government just requests that we add clarity and make sure that everyone is on the same page and move whatever proceedings we need to in front of Judge Meyer or your Honor and just schedule them expeditiously so we can all get there.

THE COURT: Yeah, I know. I agree with that and I know Officer Van Sambeck isn't going to let the ball drop on this one because I think she's here very much, Ms. Stuart, trying to help you. Probation is here to help you. They really are. I know sometimes defendants don't believe that but Probation is here to help you be successful at supervision. But like any relationship it takes two. So you have to work with Probation in order for this relationship to be successful. So I encourage

you to think about that.

Anything else?

Okay. We'll stand in recess. Thank you.

MR. HUANG: Thank you, your Honor.

(Proceedings adjourned at 2:30 p.m.)

CERTIFICATE

I hereby certify that the foregoing 24 pages are a complete and accurate transcription to the best of my ability of the electronic recording of the Compliance Review Hearing in re: UNITED STATES OF AMERICA vs. JESSICA STUART, Criminal No. 3:21-CR-00083 (JAM-1) held before The Hon. Maria M. Garcia, United States Magistrate Judge, in New Haven, Connecticut, on September 19, 2024.

Suzanne Benoit

___________________________

Suzanne Benoit, Transcriber Date: 1/20/25

LOCAL PROB 12C
(06/22)

# UNITED STATES DISTRICT COURT
## for the
## District of Connecticut

## Petition for Warrant or Summons for Offender Under Supervision

Name of Offender: Jessica Stuart

Docket Number: 0205 3:21CR00083-001

Add one more Docket Number ☐

Sentencing Judge/District: Honorable Jeffrey A. Meyer, U.S. District Judge

Reassigned to: Honorable Sarala V. Nagala, U.S. District Judge

Date of Original Sentence: October 15, 2021

Original Offense: Count 1: Health Care Fraud, in violation of 18 U.S.C. § 1347
Count 2: Using False Identification in Connection with Count One, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A)

Original Sentence: 27 Months Bureau of Prisons; 36 Months Term of Supervised Release

Type of Supervision: Supervised Release Date Supervision Commenced: December 1, 2023

AUSA: David Tien-Wei Huang Defense Attorney: Kelly Barrett

---

**PETITIONING THE COURT**

☒ To issue a summons for a violation hearing

☐ To issue a warrant

The probation officer believes that the offender has violated the following condition(s) of supervision:

Charge # 1
Mandatory #1

You must not commit another federal, state, or local crime.

On January 14, 2025, Ms. Stuart notified the undersigned that she turned herself in on an arrest warrant out of the Bristol Police Department. According to the police report, an officer was dispatched to the Bristol Adult Resource Center (BARC) for a fraud complaint. The BARC is an organization that provides services to individuals with intellectual and developmental disabilities that require 24/7 care.

The victim in this case was under the care of the facility and residing at the residential program. The Director of Residential Services reported that they recently fired an employee identified as Jessica Nourse-Stuart. She was originally hired as an assistant residential manager and was assigned to the victims group home. Upon her termination, a review of her time there revealed that she used the victim's "SNAP" card without proper authorization on two separate occasions to purchase items that were not for the client. The investigation also revealed the transactions were high amount purchases made at abnormal times for clients to be brought to the grocery store, and the transactions occurred less than 24

hours of each other. The receipts consisted of a large quantity of cooking spices, household cleaning products, food, and were not normal items the client would buy. The first transaction was on August 8, 2024 at Price Chopper in the amount of $644.76 and the second transaction was on August 9, 2024 at Price Chopper in the amount of $1,009.90, making the total amount of $1,654.66. Both receipts had Jessica Stuart's name at the top and the transactions were made while Ms. Stuart was working.

The investigation further revealed that Jessica was interviewed by the police department on November 20, 2024 and she admitted to to using the card; however, she indicated that she had been instructed by her boss to complete a "spend down" for household items of the group home. She denied using the card for any other reasons. BARC advised that Ms. Stuart's supervisor was on vacation during this time period and could not corroborate any information from Ms. Stuart. The officer was informed that a "spend down" occurs when checking accounts in SNAP go above the state allowed $1600, however this does not happen with food stamp accounts.

Based on the investigation, it was determined that Ms. Stuart was an employee of BARC at the time this occurred, and she went to Price Chopper on two separate dates purchasing large quantity of items that are undocumented and unaccounted for. The purchase amounts were not typical amounts and items commonly bought for the client and was without the permission of the cardholder or BARC. Therefore, it is alleged that Ms. Stuart used the victims card to purchase household items for personal use unlawfully. She was charged with Illegal Use of a Payment card, Receiving Goods/Services obtained by illegal Use of Payment Card and Larceny 5th Degree. She was released on a $5,000 non-surety bond with a next court date of January 24, 2025.

Charge # 2
Standard #9

If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

Based on the police report, Ms. Stuart was interviewed and questioned by a Bristol Police Officer on November 20, 2024. Ms. Stuart did not report the incident or police contact to our office.

U.S. Probation Officer Recommendations:
It is respectfully requested that a summons be issued for Ms. Stuart to appear in Court, to show cause as to why her supervision should not be modified or revoked.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On January 16, 2025

Lisa van Sambeck
U.S. Probation Officer

---

**THE COURT ORDERS:**

- [x] Issue a summons for a violation hearing Date: January 16, 2025
- [ ] Issue a warrant
- [ ] Issue a summons for a compliance review hearing Date: ____________
- [ ] Other

Sarala V. Nagala Digitally signed by Sarala V. Nagala Date: 2025.01.16 09:37:03 -05'00'
Signature of Judicial Officer

January 16, 2025
Date

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:21CR83 (SVN) |
| | : | |
| v. | : | |
| | : | January 22, 2025 |
| JESSICA STUART | : | |

**GOVERNMENT'S MOTION FOR DETENTION PENDING FURTHER SUPERVISED RELEASE PROCEEDINGS**

Pursuant to Fed. R. Crim. P. 32.1(a)(6) and (b)(2), the government respectfully moves the Court for an order detaining the defendant Jessica Stuart pending a revocation hearing of the defendant's supervised release. As explained below, the defendant poses a danger to the community if she were to remain at liberty during the pendency of these supervised release proceedings. Stuart bears the burden of demonstrating to the Court that she is not a danger to the community with clear and convincing evidence. On the record before the Court, she cannot sustain this showing.

## I. Background

On June 2, 2021, Stuart waived her right to indictment and plead guilty to a two-count information charging her with health care fraud, in violation of 18 U.S.C. § 1347, and using false identification in connection with another crime, in violation of 18 U.S.C. §§ 1028(a)(7), (c)(3)(A), and (b)(1)(D). The charges arose from Stuart stealing the identity and credentials of a Board Certified Behavior Analyst ("BCBA") in order to pose as a BCBA for Helping Hands Academy, a Medicaid-enrolled provider of applied behavior analysis for individuals—primarily children—with Autism Spectrum Disorder (ASD). A BCBA is a graduate-level certification in

applied behavior analysis, which providers employ to help address the behavioral needs of individuals with ASD. By repeatedly causing Helping Hands to submit fraudulent claims for ABA services she knew she was not qualified to provide, Stuart caused Medicaid to lose over $369,000. During a 15-month period from May 23, 2019 through September 2, 2020, Stuart caused Medicaid to pay out on over 1,900 claims related to twelve children with ASD. Stuart made at least $146,000 as a result of her fraud in less than two years.

At sentencing, the parties and the PSR agreed that Stuart's advisory Guidelines range was 27 to 33 months in prison. The government explained how Stuart's crimes hurt not only Medicaid, but the children and families who were deprived the services of a legitimate BCBA, J.S. (the BCBA whose identity Stuart stole), and the ABA profession generally. *See* Doc. No. 33 at 4-6. The government also outlined how Stuart's conduct would not have stopped but for its federal criminal investigation. *Id.* at 6.

The Court (Meyer, J.) made the following observations leading up to the imposition of sentence:

> There seems to be a fundamental dishonesty, that's my concern with you. And something as severe as actually impersonating somebody or not, whether it's this other therapist or where it's a doctor. That that raises real concerns for me in terms of how deep the inclination to do criminal things can be with you. And I'm persuaded in large part also by Mr. Huang's points about you receiving a cease and desist letter I think in May of 2019 that's talked about, the government's memorandum, and in a letter I've already received here. That didn't stop you. And then your prior involvement in the criminal justice system I think described especially in Paragraph 57 of the Presentence Report concerning your involvement with an arrest from May 24 of 2019 involving your work with an elderly woman whose money, 89-year-old woman whose money — you were supposed to be walking her dog and you gained access to her monies and misappropriated monies there that led ultimately to your conviction and sentencing this year for forgery in the third degree and larceny.

> So to me it's a bit of a pattern, I have to say. It seems to me, whether it's an elderly woman or whether it's the welfare of vulnerable children, that you've let your own self-interest come first, whether you think you're somehow serving the interests of your children itself, you of course have no right to place the interests of your children above those of other children for whom you're being paid to provide services.

Doc. No. 56 (Sent'g Tr.) at 68-69.

The Court sentenced the defendant to 27 months in jail, followed by three years of supervised release. After serving her term of incarceration, the defendant began federal supervision on December 1, 2023.

## II. The Compliance Review Hearing

On August 28, 2024, the U.S. Probation Office submitted a petition for a compliance review hearing. *See* Doc. No. 62. The petition outlined issues with Stuart's compliance under supervision almost immediately after it began: "Ms. Stuart has had numerous incidents of noncompliance with the conditions of release; specifically, with regards to being truthful with her Probation Officer and providing information as requested." *Id.* at 2. While the petition specifically charged Stuart's failure to apprise the Probation Office of her residence and failing to make restitution payments as the basis for noncompliance, it outlined Stuart's general unwillingness to comply by the Court's supervised release conditions, her lack of candor, her poor financial decisions, her resistance to assistance offered by the U.S. Probation Office, and her objections to the U.S. Probation Office contacting landlords and employers. *Id.* at 2-3. The petition concluded with the Probation Office's assessment that "[i]t appears Ms. Stuart is not making conditions of supervision a priority and willfully refuses to communicate honestly with the undersigned [Probation Officer]. She does not appear to fully grasp the seriousness of her conviction and resulting supervision." *Id.* at 3.

This Court conducted a compliance review hearing on September 19, 2024. *See* Doc. No. 73. During the hearing, the U.S. Probation Office advised that Stuart did not agree voluntarily to have her wages from her job at the Bristol Adult Resource Center (BARC) garnished. *Id.* at 13. The Court advised the defendant to get her affairs in order, work with Probation, pay the restitution she owed, and submit the information she was required to provide. *See* Doc. No. 73 at 19-20. But this Court also advised:

> But if what happens is you're not in compliance, if you continue to not pay your restitution, to hide the ball from Probation, not provide financial statements in a timely fashion, you know, incur debts that are above and beyond maybe what you have the financial capacity to bear, not allowing, you know, not communicating with Probation allowing them to visit you. If those things continue then the situation starts to escalate and then we're not talking about a compliance review hearing. What could happen next is, you know, a petition for revocation of supervised release and all these other things. And nobody in this courtroom wants to see that happen.

*Id.* at 18.

## III. The New Criminal Case

Since the compliance review hearing and the filing of the Probation Office's new petition for a summons dated January 16, 2025, the government has learned the following:

- The government was notified by the Federal Defender's Office that Stuart was terminated from her job at BARC on October 2, 2024 "based on a third party notification." The Federal Defender's Office inquired of the government whether it had notified BARC about Stuart's status and the government responded that it had not. Neither had the U.S. Probation Office. No further details were provided by either the Federal Defender's Office or the U.S. Probation Office surrounding Stuart's termination.

- After the filing of the Probation's Office petition for a summons on January 16, 2025, the government inquired of Probation whether it could share the police reports from Stuart's new arrest with the parties. The government learned that the Probation Office attempted to send the reports, but was unable to do so because of technical difficulties.

- On January 21, 2025, the government obtained reports from the Bristol Police Department directly concerning Stuart's new arrest on January 21, 2025. Federal agents then interviewed Melissa Leake, the residential services at BARC, on January 22, 2025 and obtained Stuart's personnel file on January 22, 2025. The government disclosed these materials to the U.S. Probation Office and defense counsel on the afternoon of January 22, 2025.

- The timeline of the events may be relevant to the Court's consideration concerning detention. According to receipts furnished by the Bristol Police Department, Stuart is alleged to have misused the victim's SNAP card on August 6 and 9, 2024, *before* the Court's compliance review hearing on September 19, 2024. Given the pendency of the state case, the police reports are being filed under seal with this motion as Sealed Ex. 1 and a report of interview of Leake is being filed as Sealed Ex. 2.

- According to police reports, Bristol Police Department responded to a fraud complaint by BARC on November 19, 2024. The investigating officer interviewed Stuart on November 20, 2024, but she did not report the law enforcement contact with the U.S. Probation Office.

- Stuart's personnel file from BARC is replete with misrepresentations and falsehoods.

    - Stuart's handwritten job application, *see* Sealed Ex. 3, dated May 10, 2024, and her resume, *see* Sealed Ex. 4, are made under the name "Jessica Nourse-Stuart," which is not her legal name, i.e., Jessica Marie Stuart. *See* PSR ¶ 67. Stuart did, however, use the alias of Jessica Nourse-Stuart in connection with her underlying federal case. *See* PSR ¶ 21.
    - Stuart represents that she was currently enrolled at Charter Oak. *See* Sealed Ex. 3 at 1. The USPO was unaware of such an enrollment.
    - Stuart indicated that she was then working at The Kennedy Collective and wanted to leave that job because she was "moving and want[ed] to grow." Sealed Ex. 3 at 2. Stuart reiterated that she was currently employed at the Kennedy Collective in her resume. *See* Sealed Ex. 4. She expanded on these falsehoods during the hiring process with BARC. *See* Sealed Ex. 2 at 2. Stuart told the USPO, however, that she had been fired by the Kennedy Collective in April 2024. *See* Doc. No. 62 at 2.
    - She indicated that she was employed at Helping Hands through December 2021, when in fact that ended in or around August 2020. *Compare* Sealed Ex. 3 at 2 and Sealed Ex. 4 at 2 *with* PSR ¶ 100.
    - She falsely indicated that she "[d]eveloped … individualized behavior programming," "[p]rovide[d] all appropriate supervision and competency-based training to team members on a regular basis," and "[t]rain[ed] parents of children in ABA techniques" at Helping Hands Academy in her

resume when she was not qualified or trained to do so. *See* Sealed Ex. 4 at 2.

  - She falsely indicated that she was self-employed from June 2011 to May 2017 and provided therapy and implemented treatment plans. *See* PSR ¶¶ 103-109.
  - She indicated that boyfriend at the time was in fact her spouse. *See* Sealed Ex. 3 at 4.
  - As a job reference, she falsely listed an individual as the "owner" of Helping Hands. In fact, the owner of Helping Hands was Stuart's co-defendant, Nicole Balkas, aka Nicole Steiner. The individual Stuart listed provided a positive reference during BARC's hiring process. *See* Sealed Ex. 5.
  - Stuart falsely represented to BARC that her full name was Jessica Ann Marie Nourse-Stuart. *See* Sealed Ex. 3 at 6. When BARC ran a background check under this name, Stuart's criminal history did not show up. Leake told agents that BARC would not have hired Stuart had it known about her prior convictions. *See* Sealed Ex. 2 at 1.

- Stuart is currently unemployed.

- Finally, since the compliance review hearing, Stuart has made only two additional restitution payments: on September 25, 2024 for $400 and on October 31, 2024 for $100. *See* Sealed Ex. 6. Since Stuart began supervision on December 1, 2023 up until the present, she has paid only a total of $2,149 in restitution. *Id.* Yet her paystubs from BARC show *net* earnings of $26,373.31 in less than four months alone, from the period of June 8 to September 27, 2024.

## IV. Legal Standard

Rule 32.1(a)(6) of the Federal Rules of Criminal Procedure provides that the Court may detain a defendant pending further proceedings on a defendant's revocation of supervised release. Indeed, Rule 32.1(a)(6) authorizes detention under 18 U.S.C. § 3143(a)(1), which governs release or detention pending sentencing or appeal, and not under 18 U.S.C. § 3142, which governs pretrial detention. Importantly, Rule 32.1(a)(6) expressly provides that the defendant bears the burden of proving by "clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community." At least as of now, Stuart cannot make that showing.

## V. Discussion

The public—and in particular its vulnerable populations—needs to be protected by Stuart's criminal conduct, even during the pendency of these supervised release proceedings. Stuart's history now includes victimizing children with ASD, *see* Doc. 56 at 49-53, an elderly employer, *see* PSR ¶ 57, and now a client with intellectual and developmental disabilities. The record before the Court evinces Stuart's serious risk of recidivism, lack of transparency and candor, and a continuing failure to grasp the seriousness of her situation or the Court's conditions. The Court need not wait until another victim surfaces, *after* the harm has already been done, to act in the public's interest. In any case, Stuart cannot meet her burden under Rule 32.1(a)(6) to show by clear and convincing evidence that she is not a danger to the community.

Stuart is a serial liar who has been violating the Court's conditions of release soon after supervision began. She has now been arrested on a new state fraud case. Although the loss from that case is relatively modest by this Court's standards—approximately $1,653.46—the alarming fact is that the victim is a vulnerable individual with an IQ of less than 69, has mild to moderate intellectual ability, and cannot care for their own personal or financial needs. *See* Sealed Ex. 2 at 1. As in her federal conviction and her previous state larceny conviction, it appears that Stuart has once again exploited her position of trust to victimize a vulnerable individual for her own financial gain.[1] Not only has Stuart failed to timely and fully pay restitution to her already-existing victims, but she has targeted a new victim who had been entrusted in Stuart's care.

---

[1] The government understands that the vulnerable victim is the one who bears this loss, not SNAP itself or BARC. *See* Sealed Ex. 2 at 1.

That Stuart would repeatedly lie on her job application, use a false name, fabricate a job reference, and tell an implausible cover story to her employer when confronted would be grounds enough to warrant detention. But the Court should also consider the fact that Stuart engaged in this conduct knowing that the Court and the U.S. Probation Office would be monitoring and verifying her activities. Stuart's decisions therefore demonstrate her disrespect for the law and confirm the Court's observation at the compliance hearing that Stuart "just do[es]n't care." Doc. No. 73 at 20. It is also now apparent that Stuart's pattern of resisting third party notification, office or home visits, and wage garnishment was designed to evade accountability and shield her new criminal activity, rather than advance a legitimate concern about establishing a law-abiding life. The Court should not tolerate such manipulative behavior.

In sum, Stuart has engaged in serious fraudulent behavior, both in the context of the new state criminal case as well as in her conduct with the U.S. Probation Office. There is scant indication that her condition will change notwithstanding the U.S. Probation Office's and the Federal Defender Office's efforts. Stuart's continued liberty within the community poses a real danger to others.

For the reasons stated above, the Court should detain the defendant pending further proceedings.

Respectfully submitted,

MARC H. SILVERMAN
ACTING UNITED STATES ATTORNEY

_____/s/_____________
DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct30434
U.S. Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.: (203) 821-3700

**CERTIFICATE OF SERVICE**

I hereby certify that on January 22, 2025, a copy of the foregoing GOVERNMENT'S MOTION FOR DETENTION PENDING FURTHER SUPERVISED RELEASE PROCEEDINGS was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. In addition, a copy of the foregoing was e-mailed to:

Lisa van Sambeck, United States Probation Officer

________/s/__________________
DAVID T. HUANG
ASSISTANT U.S. ATTORNEY

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | NO: 3:21CR83(SVN) |
| | ) | |
| vs. | ) | |
| | ) | January 23, 2025 |
| JESSICA STUART, | ) | |
| Defendant. | ) | Initial Appearance |
| ___________________________ | | Revocation Hearing |

141 Church Street
New Haven, Connecticut

B E F O R E:
THE HONORABLE MARIA E. GARCIA, U.S.M.J.

A P P E A R A N C E S:

For the Plaintiff : DAVID TIEN-WEI HUANG, AUSA
United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510

For the Defendant: JOHN J. STICKNEY
Federal Public Defender's Office
10 Columbus Blvd., 6th Floor
Hartford, CT 06106

Transcriber: Martha C. Marshall, RMR, CRR

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

THE COURT: Good afternoon. Please be seated.

We're here on the matter of the United States of America versus Jessica Stuart. It's case 21CR83. It's a case now assigned to Judge Nagala.

My name is Judge Garcia. If I could have the appearances of counsel, please.

MR. HUANG: Good afternoon, Your Honor.

David Huang on behalf of the Government. With me at counsel table today is HHS Special Agent Mike Ahern (ph).

THE COURT: Okay. Good afternoon to both of you.

MR. STICKNEY: Good afternoon, Your Honor.

John Stickney on behalf of Ms. Stuart. And we're ready, Your Honor.

THE COURT: Okay. Good afternoon, Attorney Stickney.

Good afternoon, Ms. Stuart.

THE DEFENDANT: Good afternoon.

THE COURT: If I could have the appearance of Probation as well.

PROBATION OFFICER: Good afternoon, Your Honor.

It's Lisa van Sambeck for Probation.

THE COURT: Good afternoon, Officer van Sambeck. Thank you for being here.

Ms. Stuart, you're here today because a Petition has been filed alleging that you violated the terms of your

supervised release. Today's hearing is scheduled -- we're going to cover a few things, but the purpose is to advise you of the substance of the allegations that are in the Petition. I'm going to advise you of some of your constitutional rights, including your right to counsel. We may set some further hearings in the case. At the end, I'm going to take up the question of your detention or your release on bond pending the resolution of the Petition.

I'm going to start with the advice of rights. And if you want to take the microphone and put it close to you, because I'm going to ask you some questions.

One of your rights is the right to remain silent. This means that you are not required to make any statement.

If you do make a statement, that statement can and probably will be used against you.

Do you understand that, ma'am?

THE DEFENDANT: Yeah.

THE COURT: If you've already made a statement, you do not need to continue.

If you start making a statement, you can stop at any time.

And if you choose to make a statement, you have the right to have your attorney with you and to confer with him about it first.

Do you understand these rights?

THE DEFENDANT: Yes.

THE COURT: You also have a right to counsel. This means that you have a right to be represented by an attorney at every stage of these proceedings. And if you can't afford an attorney, one will be appointed for you by the Court at no cost to you. I know Attorney Stickney has been appointed to represent you in this case. If at any point he can no longer represent you, the Court will make sure that alternate counsel is appointed.

Do you understand that, Ms. Stuart?

THE DEFENDANT: Yes.

THE COURT: Okay. I don't know if this applies, but I'm going to advise you that if you have citizenship rights in a country other than the United States, you have the right to request that the Government notify that country of your potential arrest. I don't want you to say anything about your citizenship on the record. But if you think you have those rights, you should discuss that matter with your lawyer privately.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. So we're here because a Petition was filed by Probation. It was filed on January 16th. It is document number 70 on the public CM/ECF website.

Does everybody have a copy of the Petition?

MR. HUANG: Yes, your Honor.

THE COURT: Ms. Stuart, have you received a copy of the Petition?

THE DEFENDANT: Yes.

THE COURT: Okay. Have you read it?

THE DEFENDANT: Yes.

THE COURT: Have you had a chance to discuss it with your lawyer?

THE DEFENDANT: Briefly, yes.

THE COURT: Would you like more time to discuss it with your lawyer? I'm happy to give you a few minutes if you'd like more time to discuss the Petition with your lawyer before I go through it.

THE DEFENDANT: No, no.

THE COURT: Okay. Well, if at any point you'd like some additional time with your lawyer, we can take a break.

Let me just summarize what's in the Petition. Okay. And I'm actually going to read the whole thing because I think it's important to put on the record what's on this Petition.

So the Petition states that you have violated -- so there's two separate charges in the Petition. The first charge, number 1, is that you violated mandatory condition number 1. And mandatory condition number 1 provides that you must not commit another federal, state, or local crime.

The Petition states that on January 14th, this year, you notified the Probation Officer that you had turned yourself in on an arrest warrant out of the Bristol Police Department. According to the Police Report, an officer was dispatched to the Bristol Adult Resource Center for a fraud complaint. The organization which is referenced as BARK, is an organization that provides services to individuals with intellectual and developmental disabilities that require 24/7 care.

The victim in this case was under the care of the facility and residing at the residential program. The Director of Residential Services reported that they recently fired an employee identified as Jessica Nourse Stuart. That she was originally hired as an Assistant Residential Manager and was assigned to the victim's group home. And that upon her termination, meaning your termination, a review of your time revealed that you had used the victim's SNAP card without proper authorization. And that on two separate occasions you had purchased items that were not for the client.

The Petition says that the investigation also revealed that transactions were high amount purchases made at abnormal times for clients to be brought to the grocery store, and the transactions occurred less than 24 hours of each other.

The Petition details that the receipts consist of a large quantity of cooking spices, household cleaning products, food, and were not normal items that a client would buy.

That the first transaction took place on August 8th, 2024, at Price Chopper, in the amount of $644.76; and that the second transaction was on August 9th, 2024, also at Price Chopper, in the amount of $1,009.90. Making a total of $1,654.66. And that both receipts had your name at the top and the transactions were made while you were working.

The Petition further states that the investigation further revealed that you, Ms. Stuart, were interviewed by the Police Department on November 20, 2024, and that you admitted to using the card; however, you indicated that you had been instructed by your boss to complete a, quote, spend down for household items of the group home. That you denied using the card for any other reason. And BARK advised that your supervisor was on vacation during the time period and could not corroborate any information from Ms. Stuart.

The officer was informed that a spend down occurs when checking accounts in SNAP go above the state allowed $1600. However, that this does not happen with food stamp accounts.

Based on the investigation, it was determined that you, Ms. Stuart, were an employee of BARK at the time this

occurred, and that you went to Price Chopper on two separate dates purchasing large quantity of items that were undocumented and unaccounted for. And that the purchase amounts were not typical amounts and items commonly bought for the client. And that this was without the permission of the card holder or BARK.

Therefore, it's alleged that you used the victim's card to purchase household items for personal use unlawfully. And you are charged with illegal use of a payment card, receiving the goods and services obtained by illegal use of payment card, and larceny fifth degree. And that you were released on a $5,000 non-surety bond with the next court date of January 24, 2025. That's the first charge.

The second charge is that you violated standard condition number 9, which provides that if you are arrested or questioned by law enforcement officer, you must notify the Probation Officer within 72 hours. And the Petition states that based on the Police Report you, Ms. Stuart, were interviewed and questioned by a Bristol Police Officer on November 20, 2024, and that you did not report the incident or the police contact to the Probation Officer. And based on that, Probation was requesting that a summons be issued for you to appear in court and to show cause as to why your supervision should not be modified or revoked.

Attorney Huang, do you have a calculation of what

the potential penalties are for these alleged violations of supervised release?

MR. HUANG: I did look at this quickly, Your Honor. I believe that the state charges were, as I think I've confirmed, were all misdemeanors. So I believe that each of them would be a Class C violation.

Ms. Stuart was a Criminal History Category II at the time of her original sentencing in front of Judge Meyer. So under 7 -- let me get to the right part, Your Honor. Under the Guidelines Section 7B1.4, I believe, she'd be a Criminal History Category II and a Grade C violation. So there would be 4 to 10 months advisory Guidelines for a violation.

THE COURT: Of a sentence of imprisonment?

MR. HUANG: Correct, Your Honor.

THE COURT: Okay. Ms. Stuart, under federal law, if you violate any of the conditions of supervised release, the Court may order your supervised release revoked or modified. If supervised release is revoked, the Court may then impose a sentence of imprisonment to be followed by additional supervised release or could modify your conditions of release.

What the Government is calculating is that based on your criminal history and the grade violations, that you are potentially facing a Guideline of 4 to 10 months period of imprisonment. That's, obviously, to be determined by Judge

Nagala when you have your Revocation Hearing.

Anything on the Petition that anybody would like to add or anything additional?

MR. HUANG: Just a couple of I think minor clarifications.

Your Honor, as an attachment to the Government's motion, we did obtain from the Bristol PD a copy of the actual receipt. So that's I think part of sealed Exhibit 1. And so I think the first transaction that is involved is actually on August 6th of 2024 and not August 8th of 2024. I believe that's actually what was in the report. But I think if you look at those receipts, I think it looks to us like August 6.

THE COURT: Okay. That's on page 7 of document 76 you're saying it starts on August 6th?

MR. HUANG: That's what it looks like to me, Your Honor. I understand it looks like a little bit unclear, but it looks like the 6th to me.

THE COURT: Well, notably, all of these events occurred before the Compliance Review Hearing that we had here.

MR. HUANG: Correct, Your Honor.

THE COURT: And then I think I should just note for the record that she notified Probation of turning herself in on January 14th, but our understanding is that she

actually -- she reported turning herself in on January 14th, but she actually turned herself into the Bristol PD on January 12th. So two days before that.

THE COURT: All right. Let me ask.

Officer van Sambeck, when did you first hear from Ms. Stuart about the contact with police and the charges?

PROBATION OFFICER: So Ms. Stuart called me I believe on a Tuesday, after she had already turned herself in and been released from the Bristol PD, which she had claimed happened on that Sunday, she turned herself in.

THE COURT: She said she turned herself in on Sunday, and you heard from her on the following Tuesday?

PROBATION OFFICER: Correct.

THE COURT: Do you recall what day that was?

PROBATION OFFICER: It would be what I put in the report which was -- I don't have it in front of me.

MR. HUANG: On the 14th.

PROBATION OFFICER: On the 14th.

THE COURT: On the 14th.

MR. HUANG: That's consistent with our understanding, Your Honor.

THE COURT: Okay. Attorney Stickney, anything from you on the Petition or the potential penalties?

MR. STICKNEY: Nothing further on the Petition or the penalties, Your Honor.

THE COURT: Okay. So, Ms. Stuart, in a moment we're going to discuss the question of your detention or release. The Government has filed a Motion for Revocation of your release and for your detention. I just need to inform you that if you are held in custody, pending a hearing on the Petition to revoke your supervised release, you have a right to a Preliminary Hearing on the allegations that are contained in the Petition. You won't have a right to a Preliminary Hearing if you're released on bond pending your final Revocation Hearing.

So for your information, a Preliminary Hearing is a hearing that would be scheduled before me or one of my other Magistrate Judge colleagues where the Government has to establish probable cause to believe the allegations contained in the Petition.

At that Preliminary Hearing, you would have the right to the assistance of your lawyer. You would have the right to cross-examine the Government's witnesses. You would have the right to object to evidence that the Government introduces except on the ground that it's unlawfully acquired. And you would have the right to present your own evidence and your own witnesses.

You also have the right to waive the Preliminary Hearing. And if you were to waive it it wouldn't waive -- and you waive your right to contest the allegations at the

final Revocation Hearing before the District Judge.

So, just generally, Ms. Stuart, do you understand your right to a Preliminary Hearing?

THE DEFENDANT: Can you repeat that, like what the difference is if I am let go? Can you just explain that again? I'm sorry.

THE COURT: Sure. If you are -- if the decision is made today that you're released on conditions, you wouldn't have a right to a Preliminary Hearing because you're not being detained. And then the issue would then be taken by the District Judge at your final Revocation Hearing. Okay. So if you're released, you don't have a right to a Preliminary Hearing.

If you're detained, you would have a right to a Preliminary Hearing. And the Preliminary Hearing would be what I described. It would be before me and you would have -- the Government would have to show probable cause that you did the things that are in the Petition. And you would have the right to present your own evidence and cross-examine.

If you're detained, you can have a Preliminary Hearing. You can also waive your right to a Preliminary Hearing. If you waive your right to a Preliminary Hearing, that doesn't necessarily -- you're not waiving your right to then contest the allegations once you get to the District

Judge. So that's a decision that if you're detained you'll make in consultation with your attorney.

Does that explain that better?

THE DEFENDANT: The District Judge meaning yourself?

THE COURT: So I am a Magistrate -- that's a fair question. So I am a Magistrate Judge. And so I'm in charge of kind of this proceeding here today. But my authority ends kind of after today. The final Revocation Hearing is going to be before a District Judge.

Your case was assigned to Judge Meyer. Judge Meyer, sadly, passed. And so your case has now been transferred to Judge Nagala. So your final Revocation Hearing will be before District Judge Nagala and any decisions related to kind of the consequences of what's on this Petition will be up to her.

THE DEFENDANT: Okay. So if I am not detained, I am basically saying that what is in this report is --

THE COURT: No, no. Do you want to have a moment to answer your client's questions and then if she has any additional questions --

THE DEFENDANT: I'm sorry.

THE COURT: No. Go ahead. Why don't you take a minute and walk her through whatever questions she has. And then, if she has additional things she'd like to ask the Court, I'm happy to do so.

MR. STICKNEY: Thank you, Your Honor.

THE COURT: Go ahead.

(Whereupon, Attorney Stickney confers with the defendant.)

MR. STICKNEY: Thank you, Your Honor.

THE COURT: All right. Any other questions on the right to a Preliminary Hearing, Ms. Stuart?

THE DEFENDANT: No, thank you.

THE COURT: All right. And we'll deal with the issue as to whether you're entitled to one at the end. We have to deal with the question of the Detention Order at least first.

So I understand the Government is moving for detention. I've reviewed the motion. I've reviewed the exhibits. I know there was a Notice of Additional Authority that was filed by you, Attorney Stickney, today. Where should we start? Who would like to start?

MR. HUANG: Thank you, Your Honor.

I, first of all, appreciate the Court's indulgence. I know I dumped a lot of information on the Court, as well as the parties but, of course, we got it, you know, when we got it set out in the motion.

I think just to reiterate. First, I think a couple of things to put on the record that I think we have learned since the filing of the motion late last night. The agents

that I work with did get a chance to speak with the Bristol PD just to try to get a better sense of the time line about what happened between August when these alleged events occurred, when the contact -- her termination in early October, the contact with Ms. Stuart before Thanksgiving, and then, you know, the time frame for when she turned herself in in January. Just to get a better sense of that.

I think there's nothing remarkable about that time line. I think it just took -- it took a little bit of time for the employer to discover the fraud. It took a little bit of time for the Bristol PD to write up the warrant. It took a little bit of time for the warrant to be signed. And so I think there's nothing remarkable about that, but we wanted just to cover our bases, make sure that there was nothing, you know, that the Court should be aware of. So that's the new information.

THE COURT: So when we were here in September, the time line is such that the alleged fraud had happened or the charges had been made, but Ms. Stuart hadn't been approached by law enforcement at that point?

MR. HUANG: Correct. Yes.

So the trips to Price Chopper occurred in early August. We were before Your Honor for the Compliance Review Hearing in mid September. And then she was not -- the Bristol PD responded to her former employer on a fraud

complaint, I believe, on November 19th. And then they interviewed Ms. Stuart on November 20th. Of course, she didn't notify Probation which is one of the charges. But I think, unbeknownst to everyone in the courtroom except perhaps Ms. Stuart, you know, this conduct had already happened by the time we were before Your Honor last time.

So I'm happy to answer, you know, any questions that Your Honor has about the record. I know there was a lot of information. But I think from our perspective, learning the new information about the interview with Ms. Leak (ph), which is sealed Exhibit 2, as well as obtaining the personnel file, I became very concerned about the danger to the community which I think the Court, you know, must consider under 32.1(a)(6).

And it wasn't just the identity of the victim and the nature of the allegation. It was a fact that there was multiple instances of dishonesty to her employer, both in her application, in the job application process. When she was confronted by her employer about what had happened, her failure to report this to Probation. And so in some ways part of, I think, the reason this is all rushed is because Ms. Stuart didn't comply with her obligations to the Court. She didn't notify Probation when she was contacted by the police. She didn't pay her restitution. And so in some ways I think we are all here because of her non-compliance. And I

think the arrest itself, I think, just crystallizes issues that I think the Court had already tried to address with her back in September and I think, you know, still with Probation since then.

And so given her history of victimizing particularly vulnerable populations, people who would have a difficult, if not impossible, time to stand up for themselves, we are concerned about her remaining at liberty pending further proceedings because we do not want any more victims to be defrauded as a result of Ms. Stuart's conduct.

And I completely understand if Attorney Stickney wants more time, because we just put all this information out there. But I don't -- I haven't thought about what potential conditions, short of incarceration, would be appropriate that would alleviate our concerns. I'm happy to think about it and talk about it if there's a proposal. But I don't see that right now, because the Conduct that Ms. Stuart engaged in in her underlying offense, as well as her new offense, are not, you know, are things that can be done on paper, done online. Fraud is not something where you could GPS it to a point where like it's, you know, the risk could be mitigated. And so that's where we are, Your Honor.

THE COURT: Thank you. And I appreciate putting together the information even if kind of last minute, but having it available to everybody for purposes of today.

MR. HUANG: Thank you.

THE COURT: Attorney Stickney.

MR. STICKNEY: Thank you, Your Honor.

The Government's correct. If the Court is inclined to detain today, I would ask for more time just so I can get a little bit more of a grasp for what's going on in the discovery materials.

I don't believe there's any reason to detain. I don't believe Ms. Stuart is a danger to the community. I don't think that there's any worry that she's a flight risk. She came to court today.

THE COURT: I'm not concerned about flight risk. I am very much concerned about danger to the community.

MR. STICKNEY: And I assume that's the Court's concern based on the Government's motion as well.

To highlight a couple things. I do think the time line is very important. The Compliance Hearing happened after the alleged incident. I do have an email. On September 11th, the Financial Litigation Unit reached out to Ms. Stuart's employer to start the garnishment of her wages. And so that's when her employer was sort of put on notice that she had some reason to have her wages garnished. There is part of the discovery materials where there's some inner office emails and that sort of seems to be when her employer starts to realize that Ms. Stuart had criminal history. That

seems to be when they started to decide to fire Ms. Stuart. At least that's what it seems to me. I don't know when they actually discovered or when they started being suspicious about those receipts. I don't think it's clear from the police report or from her statement when she clocked those receipts as being suspicious. Those were from August. She wasn't fired until October and she's still doing her regular duties. The same sort of thing if they were worried about her, I'm assuming they would have taken her out of her regular duties before then. But in those emails it seems very clear that they became aware of her criminal history.

And in talking about that, I know the Government is concerned, and so is Ms. Leaks, about her using sort of an alias when she applied. I did a very cursory email -- not email search, a online search. And I searched Jessica Nourse Stuart Helping Hands Academy. And the only hits I got were employee of autism services agency pleads guilty to Healthcare in the news, owner of child autism services agency. Every single hit I got was essentially the federal case using the name that she used in her resume. So I don't think that she's using her name to sort of be deceitful. That is her name. It might not be her legal name, but it is her maiden name is my understanding. Nourse is her maiden name.

Her application, her resume, when she applied for

this position, I believe it was -- the application was submitted in May. She was terminated from her previous position in April, I believe. I think there was a similar incident where her employer was called by a third party to either verify employment or wages or something along those lines, and then she was terminated because of her criminal history.

She's applying to all of these positions on Indeed. Indeed, you upload your resume. Should she have changed her resume? Yes, I think we're all taught that. I think we're all supposed to keep our resume updated. She didn't. And I think that's clear. I don't think that's a danger to the community. That is something that they could have verified themselves. And so it's not that she's being secretive -- sorry. It's not that she's being deceitful in that sense, because all of these are very easily to be verified. Again, I just did a very cursory internet search.

We did file I guess an advisory with the authority. Judge Underhill, I think it was just yesterday, he filed this order. I understand that Judge Underhill might not be speaking for every single Judge in this District. However, we would present that that should apply. That detention should not be an option in this case, because Ms. Stuart is not presently awaiting imposition of a violation sentence.

She has not yet pleaded guilty or been found guilty of any violation. And so the Court should not detain her because there's no authority to detain her according to Judge Underhill's decision.

And I apologize, Your Honor. I'm kind of jumping around.

I would also note, in speaking with her Probation Officer, I do understand that there are some concerns outside of what's in the charged conduct. But I do think that there are conditions that can be imposed that would address those. I believe that there were conditions that her Probation Officer was thinking of prior to last night's filing.

Ms. Stuart is engaged in a program and she has some classmates here today who talk about what a good classmate she is. It's the Connecticut Recovery Coach Academy. They told me that she's always the first one there and the last one there. They said that they would be willing to speak to the Court if the Court would like to hear from them. I'm not sure if the Court would want to hear from them, but they're here to show their support. This is something that she's done on her own. This is something that she started after she was terminated from the BARK position.

THE COURT: Is it the Connecticut Recovery Coach Academy?

MR. STICKNEY: Correct.

THE COURT: Where is it located?

THE DEFENDANT: It's nationwide. So it's CCAR. I don't know that's the exact --

MR. STICKNEY: Where do you go for your classes?

THE DEFENDANT: Oh, I went to The Lighthouse. But it was actually through the New Canaan Library where I started taking classes.

THE COURT: Okay. So I was told Connecticut Recovery Coach Academy?

THE DEFENDANT: I don't know that's the exact --

MR. STICKNEY: CCAR is --

THE COURT: I mean, I'm familiar with CCAR.

THE DEFENDANT: Yeah, that's what it is. It's the national Recovery Coach -- it's nationwide.

MR. STICKNEY: I might have gotten the acronym incorrect. I apologize.

THE COURT: I think Officer van Sambeck may have some information.

PROBATION OFFICER: I believe that she's discussing or what they're referring to is the individual that I referred her to where she got assistance to join CCAR and was provided a training program through an individual that I hooked her up with through our Support Court program. And that individual was able to get her into a program that she did for about, I believe, it was a week that she did for a

certification, I believe. And if she's continuing to go there, that's unbeknownst to me.

THE COURT: When was the last time you went to the program?

THE DEFENDANT: I've been volunteering in Torrington.

THE COURT: When was the last time you were there?

THE DEFENDANT: Oh, geez. At least a couple of weeks ago.

THE COURT: Can you be more specific?

THE DEFENDANT: Right after the New Year, because there's a lot of relapses and everything. So I was volunteering services and continuing ed hours you need in order to get your full certification.

THE COURT: So what did you do at the beginning of the year?

THE DEFENDANT: Just went and helped out where they needed me.

THE COURT: You went to Torrington?

THE DEFENDANT: Yes.

THE COURT: To where?

THE DEFENDANT: The CCAR building.

THE COURT: And what did you do there?

THE DEFENDANT: I just talked to a couple different people that were there. Helped out making lunch. There was

nothing like --

THE COURT: Was that the last time you were there?

THE DEFENDANT: Yes.

THE COURT: And before then, when was the last time you were involved in this?

THE DEFENDANT: I honestly can't remember.

THE COURT: To the extent that -- I mean, it doesn't sound really compelling, Attorney Stickney. It doesn't sound like something she's committed to. But go ahead.

MR. STICKNEY: I understand, Your Honor.

As far as her state case, it is pending. As the Government said, these are misdemeanors. She has a state court appearance tomorrow. We are asking that she be released so that she can continue to go to her state court appearances and so that she can continue to participate in those. She has a vested interest to make sure that she appears and takes care of those state cases.

But, again, the time line of this --

THE COURT: I understand the time line, Attorney Stickney. But the allegations in the Police Report, you know, about defrauding individuals who are vulnerable, it's just really concerning. It's really concerning. And the Government quoted some of Judge Meyer's statements in their motion about just this pattern of deceit and dishonesty. You know, even here today, she's making -- having you make --

suggesting to you about representations about her involvement with CCAR. You know, it's like isn't meaningful. It's insubstantial. Is it going to move the needle? Is it honest? Is it truthful?

When we were last here in September, I know Probation had a lot of concerns about what has she told her employer. What does her employer not know? What's going on with the name? Why isn't she paying restitution? Why can't we garner the wages? I mean, it's like smoke and mirrors at the expense of vulnerable people. People with disabilities. It's just not okay. It's a danger to the community to have -- you're just thinking what you want to respond, Ms. Stuart. Like at some point, you know, when does the lying and the deception end? And, you know, you've hurt people in your life. You have a Probation Officer who's been trying to connect you to resources. You've been lying to her. And so, yes, the danger to the community is really real here. Because there doesn't seem to be an ability to get off of the path of lying and deception, at least the record before the Court.

This conduct that's being alleged here in these state charges is not dissimilar from what you pled guilty to and for what you did a period of incarceration. And, you know, these little lies and these little things in your resume and what you told your employer. Like, maybe one

little thing. But the totality of it, the combination of it, just shows a consistent deception. And so I -- what I'm curious to hear is whether there are conditions that you're proposing that would mitigate the risk of danger to the community. Because going back to the same is just not -- you're going to be able to speak in a moment, Ms. Stuart. You have state charges pending. So I would just advise you that anything you say can and will be used against you. You're free to address me, but I just want you to be careful and make sure that you use your lawyer here.

So, you know, I'm aware of the *Maldonado* decision. I'm not bound by it. I think there's a real issue here with danger to the community that hasn't been addressed.

MR. STICKNEY: My understanding in the previous hearings there's been talk about third party -- I forget exactly how it was phrased. If she is employed, to have the employer notified that she does have criminal history. I think that's going to be harder for her to get employment, but I do think that is something --

THE COURT: It doesn't justify -- I mean, I run Support Court here. You know, individuals have an incredibly difficult time securing employment. And that's just the reality of having a federal or state record. It doesn't -- but it doesn't justify the deception.

MR. STICKNEY: I think that would be a condition

that the Court could impose that would ensure that she wouldn't be a danger to the community. I think those are the the type of conditions that the Court could impose if the concern is further deception with employment. I think those are the types of conditions that I would propose. Whether or not that is effective now, I know that she's applying for jobs. I know that she doesn't have employment now. But that would be what I would propose, Your Honor.

THE COURT: I mean, I'm worried about the deception to the employer. And I'm worried about if and when the employer gives her an opportunity, the deception then within the employment, such that people of the community could be vulnerable. And so it's layers.

Are there any conditions that you're proposing here today in terms of to address the danger to the community, the real danger to the community?

MR. STICKNEY: I would simply ask the Court because it's -- I would ask for more time just so I can get a bond package prepared so that I can come up with conditions that the Court can consider. I don't have any other conditions that I've proposed or that I can address the Court's concerns.

THE COURT: I mean, employment seems to be an issue. Because that seems to be a gateway for Ms. Stuart to do -- engage in unlawful activity. Yet she needs to be

employed because she -- you know, we haven't heard why she hasn't paid her restitution. And so I think about a condition like home incarceration, for example. You know, just remaining home until her Revocation Hearing before Judge Nagala, and putting her on some location monitoring. But those are things that need to be explored and I'm not hearing any of that at this point. A custodian, you know. Someone who could be eyes and ears of the Court to ensure that she's, you know, staying on the straight and narrow. But, again, I'm not hearing any of those conditions being proposed here right now. Maybe they need to be explored.

MR. STICKNEY: Your Honor, if I could have a moment just to talk to see if --

THE COURT: Perhaps we could continue this hearing until tomorrow to allow you more time, but I'm really concerned here.

Officer van Sambeck, is there something that you wanted to add in terms of conditions?

PROBATION OFFICER: Not necessarily in terms of conditions. I know that initially that was my thought, was that we could try to put together some conditions.

I do think we need something that prohibits her from working with a population of vulnerable individuals as this seems to be her history. But, clearly, third party risk is something else. But these would also be pretrial conditions

and they don't follow over to her post-conviction. So I worry about the procedural process with imposing conditions on the pretrial side and how it would carry over to the post-conviction side.

I would have to explore more conditions possibly with the Government, which is something that we had had discussions about possibly fashioning some ideas. But then when this other information came to light and we found out more about the lying on the application, for example, the lying that she's doing to get the jobs. And she said she was employed when she applied to the BARK Association and she, in fact, was not employed. She had been fired. You know, she had stated that she was leaving because she was going to China for six weeks or six months. It's not true. And it's unfortunate that that wasn't explored more. But that's the kind of things she's putting on applications which worries me as to what is she putting on her applications and how is she getting interviews, if she's not being honest, not being upfront.

So, you know, from Probation's perspective, we have no confidence in her whatsoever with her being honest with us at all, especially since I've been working with her and all I get is smoke and mirrors. I have tried to ask her to be honest with me. I've tried to tell her I'm here to help you if you're honest with me. And I'm not getting honest answers

from her. Some of them seem to checkout and others don't.

And especially with this new information, you know, I think one of the concerns I had at the last hearing, I had said to Your Honor that we were concerned about her having access to any money, any kind of money at all. And she said she had no access to money. Well, come to find out she did. And that is -- it's very problematic. She even had a company credit card according to the interview. She didn't disclose that to us. She said time after time after time she had no access to clients' monies. She had no access to funding. She was just a manager.

So statements like that, and that is where I have a lot of concern, and that's where Probation is also seeking detention for a period of time until we can come up with some conditions, because she is a danger to others with her constant lying and manipulation.

THE COURT: Mr. Huang, anything else from the Government?

MR. HUANG: Your Honor, we are certainly prepared to -- and, again, I understand Attorney Stickney's new not only to these proceedings, but also to the case. So we are fully prepared to come back tomorrow, whenever the Court wants to see us, when Attorney Stickney can propose some conditions. And I think we'll certainly be open-minded to what those are. However, I think it goes without saying, we

would not have filed a motion if we did not feel strongly that there is this wide distance between sort of where she's at and what the danger to the public is. And I think unless and until those will be remedied, I think she needs to be detained.

THE COURT: I mean, the Petition was filed February 16th?

MR. HUANG: January 16th.

THE COURT: Sorry. January 16th. And it's January 23rd. I would have actually liked to have this hearing earlier than sooner. It didn't happen I think because of everybody's schedule.

I mean, at this point, Attorney Stickney, I don't think you've met your burden here today and I think detention would be appropriate. And come back when you have something to propose to the Court that mitigates the danger to the community.

And I'm happy to set a hearing date today or if you'd like to contact the Court when you have something to propose to the Court we could schedule it then.

How would you like to proceed? Do you want to take a minute?

MR. STICKNEY: Yes, if I could.

THE COURT: Go ahead.

MR. STICKNEY: Judge, if we could set it as early as

possible. I think if we could get it on the calendar, I think that would be better.

THE COURT: All right.

MR. STICKNEY: And I've asked, but just to put it on the record again. I would ask for home confinement while we wait for the Detention Hearing so we can get more in order.

THE COURT: The request is denied. Like I said, I don't think you've met your burden, your 32.1(a)(6). But let's schedule a hearing.

Would tomorrow be too soon?

MR. STICKNEY: If it is, Your Honor, I can always reach out to the Court and ask maybe to push it out if that wouldn't be a bother.

THE COURT: I'd have to move some things around, because I have a change of plea in the afternoon.

Officer van Sambeck has done a lot of work with Ms. Stuart. She needs to be involved in this process of crafting conditions, to the extent there are even any, that would work in this case. And so while I understand your client wants the hearing sooner rather than later, I think that whatever is going to be presented to the Court has to be really thoughtful and include Officer van Sambeck. Because she's -- from what I understand, she has been trying to help Ms. Stuart to think about jobs, for example, that don't put her in contact with vulnerable population. And from what I

understand from Officer Sambeck, there's been a lot of push-back from Ms. Stuart and a lot of what I like to call yeah butting, I can't do that, I can't do this. And so this is kind of like there needs to really be a very thoughtful conversation from everybody here about a plan that is going to be adhered to and that makes sense in light of the real danger to the community.

So I think what we should do, in order to allow this dialogue to happen and given my schedule, is that we schedule something for Monday afternoon.

Does that work for you, Officer van Sambeck? Because I know you're coming from --

PROBATION OFFICER: Yes, Your Honor. We'll make it work.

THE COURT: Does that work for you, Attorney Stickney?

MR. STICKNEY: Yes, Your Honor.

MR. HUANG: Yes, Your Honor.

THE COURT: So let's set it for Monday, January 27th. Let's have it at 2:30 in the afternoon.

MR. HUANG: I'm sorry?

THE COURT: 2:30.

I'll enter an order provisionally of detention, but it's without prejudice to the hearing on Monday.

Anything else we need to do today?

Oh, your final Revocation Hearing, Ms. Stuart, is scheduled for February 20th, 2025. And that's before Judge Nagala at 2:00.

MR. HUANG: Your Honor, in light of Your Honor's Detention Order, and I must admit I have not been in this posture, I think the rule provides for a Preliminary Hearing sort of promptly. But given the fact that we're going to be here in court again on Monday, I don't think there's a need to have a Preliminary Hearing before then, but I just wanted to be sure of that.

THE COURT: That's a very good point. We could -- you could have a Preliminary Hearing. Obviously, you're entitled to it given my Detention Order. We could schedule that if you'd like to. Or you could reserve on your desire to either schedule or waive the Preliminary Hearing based on the outcome of Monday.

MR. STICKNEY: I think we'll reserve based on the outcome of Monday, Your Honor.

THE COURT: Okay. And I kind of remind everybody that we'll revisit the issue on Monday.

MR. HUANG: Thank you.

THE COURT: Thank you for bringing it to the Court's attention.

Anything from Officer van Sambeck?

Okay. We'll stand in recess.

(Proceedings concluded at 1:15 p.m.)

C E R T I F I C A T E

I, Martha C. Marshall, RMR, CRR, hereby certify that the foregoing pages are a complete and accurate transcription to the best of my ability of the electronic recording held in the matter of UNITED STATES OF AMERICA VS. JESSICA STUART, which was held before the Honorable Maria E. Garcia, U.S.M.J., at 141 Church Street, New Haven, Connecticut, on January 23, 2025.

/s/Martha C. Marshall
Martha C. Marshall, RMR,CRR
Transcriber

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:21CR83 (SVN) |
| | : | |
| v. | : | |
| | : | January 27, 2025 |
| JESSICA STUART | : | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DETENTION PENDING FURTHER SUPERVISED RELEASE PROCEEDINGS**

The government hereby files this supplemental memorandum to advise the Court of additional information that has come to light since the January 23, 2025 hearing.

*First*, the government has obtained the personnel file from Stuart's previous employer, the Kennedy Collective, and interviewed its director of human resources. A report of interview of Missy Cascio is attached as Sealed Exhibit 7. The Kennedy Collective employed Stuart for approximately three months from January to April 2024. According to Cascio, everything with Stuart's employment seemed fine until The Kennedy Collective received an anonymous tip from someone to Google Stuart's name. Stuart's criminal history did not show up on her background check because The Kennedy Collective only checked for the name "Nourse-Stuart," i.e., the name under which Stuart applied, and not her true name. Stuart was terminated on April 30, 2024. By letter dated April 30, 2024, The Kennedy Collective informed her that "serious recent concerns have arisen regarding your background check clearance. As stated during our meeting, you did not meet the successful completion of a background check." Sealed Ex. 8.

A review of Stuart's job application and resume to The Kennedy Collective, *see* Sealed Exs. 9 and 10, reveals many of the same false statements as in her subsequent application to

BARC identified in the government's initial detention motion.[1] More concerningly, these documents show that, notwithstanding her termination as a result of using false information in her job application, Stuart nevertheless continued to use the same false information when she applied to BARC shortly thereafter.

*Second*, although Stuart began working at BARC on June 10, 2024, she continued to collect unemployment benefits through July 2, 2024. Department of Labor records show that Stuart submitted weekly certifications to the Connecticut Department of Labor on June 8, June 15, June 22, and June 29, 2024 that falsely represented that she had no definite return to work date and had not performed any work in the previous week. *See* Sealed Ex. 12. As a result, Stuart collected $572 of unemployment benefits. Stuart's paystubs from BARC, however, show that she made $5,626.19 for the time period of June 8 through July 5, 2024. *See* Sealed Ex. 13.

*Third*, a closer scrutiny of Stuart's paystubs at BARC revealed that she claimed to have worked, and was paid for, an average of 71 hours a week, every week, during her short tenure. Stuart's last paycheck, for the time period of September 14-27, 2024, shows that she was paid for 204.75 hours of alleged work. In a follow-on interview with Melissa Leake at BARC, the government inquired whether Stuart did, in fact, work such hours. *See* Sealed Ex. 14. Leake answered that there would be no reason for Stuart to work that many hours, thought Stuart was taking advantage of the situation when Stuart's direct manager was on vacation, and would not have had permission to work up to 20 hours a day. *Id.* Leake acknowledged, however, that Stuart had a lot of independence and not much oversight at BARC. *Id.*

---

[1] Stuart authorized a background check under the name of "Jessica Anne Marie Nourse-Stuart," which is yet another variation of her name. She applied under BARC under the name "Jessica Ann Marie Nourse-Stuart," without the "e" after Anne. *Compare* Sealed Ex. 11 *with* Sealed Ex. 3 at 6.

*Finally*, the Bristol Police Department contacted Stuart about her state arrest warrant on January 6, 2025. Similar to her failure to report law enforcement contact on November 20, 2024, Stuart did not report the January 6, 2025 contact to the U.S. Probation Office either.

Respectfully submitted,

MARC H. SILVERMAN
ACTING UNITED STATES ATTORNEY

_____/s/_____________
DAVID T. HUANG
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct30434
U.S. Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.: (203) 821-3700

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2025, a copy of the foregoing GOVERNMENT'S MOTION FOR DETENTION PENDING FURTHER SUPERVISED RELEASE PROCEEDINGS was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. In addition, a copy of the foregoing was e-mailed to:

Lisa van Sambeck, United States Probation Officer

________/s/_________________
DAVID T. HUANG
ASSISTANT U.S. ATTORNEY

LF12B - 1
(10/2024)

# UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT
PROBATION OFFICE

UNITED STATES OF AMERICA

CRIMINAL NO. 0205 3:21CR00083-001

v.

Jessica Stuart

## **Report on Violation of Supervised Release**

Original Sentence Information

On October 15, 2021, Jessica Stuart appeared before the Honorable Jeffrey A. Meyer, U.S. District Judge having pled guilty to Count 1: Health Care Fraud, in violation of 18 U.S.C. § 1347; and Count 2: Using False Identification in Connection with Count One, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A). Jessica Stuart was sentenced to 27 months' imprisonment to be followed by a term of 36 months' supervised release. Ms. Stuart's supervision commenced on December 1, 2023 and was set to expire on November 30, 2026.

The Court imposed the following Special conditions:

1: You must participate in educational and/or vocational services program and follow the rules and regulations of that program. Such programs may include, but are not limited to, job readiness traiing and skills development.

2: You shall not seek or maintain employment in the field of applied behavior analysis without prior approval form the U.S Probation office

3: You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The Probation Office may share financial information with the U.S. Attorney's office.

4: You must pay any restitution that is imposed by this judgment in a lump sum immediately. If you are unable to pay the full balance in a lump sum, any remaining balance is payable at a rate of not less than $100 per month or 10% of your gross monthly income, whichever is greater. The monthly payment schedule may be adjusted based on your ability to pay as determined by the probation officer and approved by the Court.

5: You must participate in a program recommended by the Probation Office and approved by the Court for mental health treatment. You must follow the rules and regulations of that program. The Probation Officer, in consultation with the treatment provider, will supervise your participation in the program. You must pay all or a portion of the costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.

6: You shall has no direct or indirect contact with Jessica Schleicher, nor use Jessica Schleicher's name and/or identifying information in any way.

7: You must participate in a program recommended by the Probation Office and approved by the Court for inpatient or outpatient substance abuse treatment and testing. You must follow the rules and regulations of that program. The probation officer will supervise your participation in the program. You must pay all or a portion of the costs associated with treatment based on your ability to pay as recommended by the probation officer and approved by the Court.

**Summary of Original Offense**

Beginning in or around May 23, 2019 and continuing until approximately September 2, 2020, Ms. Stuart devised and engaged in a scheme to commit health care fraud by causing fraudulent claims for applied behavioral analysis services to be submitted to Medicaid. In the course of the scheme, Ms. Stuart used the identity of Jessica Schleicher without Schleicher's knowledge or authorization so that Ms. Stuart could impersonate a Board-Certified Behavior Analyst (BCBA). The reasonably foreseeable loss attributable to Ms. Stuart from the scheme is $369,439.96.

**Facts of Violation**

**Charge # 1**
Mandatory #1: The defendant shall not commit another federal, state or local offense.

On January 14, 2025, Ms. Stuart notified the undersigned that she turned herself in on an arrest warrant out of the Bristol Police Department. According to the police report, an officer was dispatched to the Bristol Adult Resource Center (BARC) for a fraud complaint. The BARC is an organization that provides services to individuals with intellectual and developmental disabilities that require 24/7 care.

The victim in this case was under the care of the facility and residing at the residential program. The Director of Residential Services reported that they recently fired an employee identified as Jessica Nourse-Stuart. She was originally hired as an assistant residential manager and was assigned to the victim's group home. Upon her termination, a review of her time there revealed that she used the victim's "SNAP" card without proper authorization on two separate occasions to purchase items that were not for the client. The investigation also revealed the transactions were high amount purchases made at abnormal times for clients to be brought to the grocery store, and the transactions occurred less than 24 hours of each other. The receipts consisted of a large quantity of cooking spices, household cleaning products, food, and were not normal items the client would buy. The first transaction was on August 8, 2024 at Price Chopper in the amount of $644.76 and the second transaction was on August 9, 2024 at Price Chopper in the amount of $1,009.90, making the total amount of $1,654.66. Both receipts had Jessica Stuart's name at the top and the transactions were made while Ms. Stuart was working.

The investigation further revealed that Jessica was interviewed by the police department on November 20, 2024 and she admitted to to using the card; however, she indicated that she had been instructed by her boss to complete a "spend down" for household items of the group home. She denied using the card for any other reasons. BARC advised that Ms. Stuart's supervisor was on vacation during this time period and could not corroborate any information from Ms. Stuart. The officer was informed that a "spend down" occurs when checking accounts in SNAP go above the state allowed $1600, however this does not happen with food stamp accounts.

Based on the investigation, it was determined that Ms. Stuart was an employee of BARC at the time this occurred, and she went to Price Chopper on two separate dates purchasing large quantity of items that are undocumented and unaccounted for. The purchase amounts were not typical amounts and items commonly bought for the client and was without the permission of the cardholder or BARC. Therefore, it is alleged that Ms. Stuart used the victim's card to purchase household items for personal use unlawfully. She was charged with Illegal Use of a Payment card, Receiving Goods/Services obtained by illegal Use of Payment Card and Larceny 5th Degree. She was released on a $5,000 non-surety bond with a next court date of March 28, 2025.

**Charge #2**
Mandatory #1: The defendant shall not commit another federal, state or local offense.

During the investigation into Ms. Stuart, the Government requested financial records and records of employment/unemployment through the Department of Labor. Records revealed that Ms. Stuart began working at BARC on June 10, 2024; however, she continued to collect unemployment benefits through July 2, 2024. Department of Labor records reveal that Ms. Stuart submitted weekly certifications to the Connecticut Department of Labor (on June 8, June 15, June 22, and June 29, 2024), that falsely represented that she had no definite return to work date and has not performed any work in the previous week. As a result, Ms. Stuart collected $572 of unemployment benefits. Ms. Stuart's paystubs from BARC revealed that she made $5,626.19 for the time period between June 8 through July 5, 2024.

**Charge # 3**
Standard #9: f you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

Based on the police report, Ms. Stuart was interviewed and questioned by a Bristol Police Officer on November 20, 2024. Ms. Stuart did not report the incident or police contact to our office.

On January 6, 2025, Ms. Stuart was notified of an outstanding warrant by the Bristol Police Department. She did not report the outstanding warrant to the Probation Office. She subsequently turned herself in on January 12, 2025, and only made notification to our office two (2) days later, on January 14, 2025, stating that she had turned herself in on an arrest warrant on Sunday January 14, 2025, and had been processed and released the same day.

## Sentencing Information

**Custody**

Statutory Provisions:

Because the original offense was a Class C felony, the maximum term of imprisonment that may be imposed is two years upon finding of violation and revocation; 18 U.S.C. § 3583(e)(3).

**Supervised Release**

Statutory Provisions:

When a term of supervised release is revoked and the defendant is required to serve a term of imprisonment, the Court may include a requirement that the defendant be placed on a term of supervised release after imprisonment. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release; 18 U.S.C. § 3583(h).

Because the original offense was a Class C felony, the maximum term of Supervised Release that may be reimposed is three years, less any term of imprisonment that is imposed; 18 U.S.C. §3583(b)(1) (2) or (3).

Guideline Provisions:

Based upon a finding of a Grade B violation, and an original criminal history category of II, the revocation guideline imprisonment range is 8-12 months; U.S.S.G. §7B1.4(a).

Based upon a finding of a Grade C violation, and an original criminal history category of II, the revocation guideline imprisonment range is 4-10 months; U.S.S.G. §7B1.4(a).

**Supervision Adjustment**

Ms. Stuart was released to supervised release on December 1, 2023. Since that date, she has actively defied the conditions of supervision and had numerous incidents of noncompliance that were outlined in the compliance review report that was submitted to the Court on August 28. 2024. Specifically. Ms. Stuart continually engaged in dishonesty, refusing to provide information when requested, and accountability.

Throughout this past year, Ms. Stuart has engaged in a patter of dishonesty, often acting against her own best interest. For example, she lied about the start date of employment with her first job with the Kennedy Collective. Based on her work schedule she made it challenging to visit her and would often create a narrative to avoid community and/or home visits. Additionally, she was combative and argumentative when it came to restitution payments and returning financial documents. Initially, she was not making payments and it took her approximately three months to return financial documents. She repeatably told this officer that she did not have any extra money for restitution; however when she finally returned her financial statements it revealed that Ms. Stuart and her boyfriend leased a 2024 Jeep Wrangler in December 2023 and she was financially responsible for making the monthly payments in the amount of $822.01. Her bank statements revealed that her bank account was used for the automated monthly payments that were being debited from her account. Ms. Stuart's response to this was that this was the "cheapest" car she could get and her boyfriend leased it for her, however she was financially responsible for the payments.

Regarding her employment with the Kennedy Collective, the undersigned had significant concerns with her job responsibilities. This officer was aware her position was Assistant Manager with the company, and she was working with adults with disabilities, however the undersigned was unaware if she had access to clients' personal information and/or access to business/client money or medicare transactions. Ms. Stuart did send a "duties and responsibilities" form which did suggest she had access to "petty cash purchases from the program." She insisted she did not have this access to medicare transactions and personal information. However, she did admit that she did not disclose her criminal background, and that they did a criminal background investigation on her. She was encouraged to disclose this information; however she refused, and she was clear that probation was not allowed to make any visits to this location or around the location and were not allowed to talk to her employer. The undersigned had discussed with her attorney the possibility of obtaining third party risk special condition, however Ms. Stuart was fired before we could

come to an agreement. Of note, it was later discovered by the Government that she did not use her legal name for her background check or work application.

Ms. Stuart began collecting unemployment benefits in the amount of $143 beginning on May 5, 2024 and she collected until July 2, 2024. This is problematic and is another example of Ms. Stuart's inability to be honest and her compulsive need to hide information as she gained employment with Bristol Adult Resource Center (BARC) on June 10, 2024. Again, she was hired as an Assistant Manager which brought on the same concerns as with the previous employer and Ms. Stuart did not notify her employer of her criminal background, stating that they did a background check on her and she was cleared. The same rules appeared to apply with this employer and the undersigned was not allowed to come to visit her at work or near her place of employment. Additionally, she often reported working 12-14 hours shifts due with overtime which often made it difficult for supervision purposes. Furthermore, it was unclear if she was actually working the amount of hours she was reporting and when the hours were being done. For example on June 16, 2024, she sent a text message to the undersigned and her attorney stating that she was called in for random drug testing the following day, June 17, 2024 at MCCA. She explained that she would never make it to drug testing as she was scheduled to work from 6:45AM-10:30PM with only one 30 minute break, essentially stating that she was doing a 16 hour shift. The undersigned required verification from the employer in order to excuse her. Verification was not received and she went to her drug test as required. Later, time sheets were provided to the undersigned from her attorney in order to prepare for the noncompliance hearing that was held in September 2024. In reviewing the records, it revealed that on June 17, 2024, Ms. Stuart worked from 6:10 AM-3:50PM. It remains unclear as to why Ms. Stuart felt the need to be dishonest with probation for regular supervision requirements.

Additionally, although she reported working overtime hours, she continued to have difficulty making her restitution payments, often stating she had no money. What is most notable about her statements is, her last paycheck provided to our office was dated as August 29, 2024, for a pay period that was between August 3rd to August 16th. This paycheck reflected that she worked 138 hours and had a gross year to date earnings of $19,329.49. Therefore in the short time period (two and a half months) she was making a significant amount of money and did not make restitution payments a priority. In fact, she only caught up with payments after her non-compliance report was filed with the Court. It should be noted that she has not made any payments since her last payment of $100 in October 2024. The government obtained further information regarding her paychecks and the last paycheck received appeared to be on October 10, 2024 with a reported total work hours of 204.75 hours between September 14-27, 2024. Her total net pay was $4,479.13 with a total year to date balance gross pay of $33,671.30. Since she started supervision, she has made a total restitution payment of $2,649.00 with a remaining balance of $336,912.41. Her total net income while she worked at BARC is $26,373.31.

In addition, in July 2024, Ms. Stuart's living situation became unstable and she needed to relocate from her residence. She found an apartment in early August 2024. Despite the amount of money was she making, Ms. Stuart put the priority on her apartment. She borrowed $2300 from her sister (verified) and paid her sister back that same month. It is further noted that the lease was signed on August 7, 2024, and the conduct in the new state arrest where she allegedly used the victims SNAP benefits on Augusts 8th and August 9, 2024 totaling an amount of $1,654.66. Moreover, when she initially moved, she did not report the move to probation. Probation had prior discussions with her in attempts to provide housing assistance, however Ms. Stuart made a choice to not be forthcoming with her landlord and did not want probation involved. Therefore, she found other means to obtain her apartment and did not notify probation when she moved, or that she was financially able to do so.

Shortly after the noncomplaince hearing, Ms. Stuart contacted probation and advised that BARC found out about her criminal record and she was fired from BARC. She was upset, however she noted that she would collect unemployment and continue to look for employment. She was encouraged to tell the truth to potential employers in the future, as this was second time this happened. It was also suggested that she look for a different line of work, however Ms. Stuart was not receptive to that idea.

Follow up discussions were had and Ms. Stuart continued to report that she was applying to jobs. Probation referred her to CCAR and connected her to an individual who had multiple resources within CCAR to help enhance her vocational skills. She was given a scholarship to attend an in person week long training course through Recovery Coaching Academy where she received her level 1 certificate for recovery coach. she was encouraged to attend additional trainings to become fully certified as a recovery coach, however she did not follow through. It should be noted that a level 1 certificate would enhance employment opportunities for entry level positions at recovery centers. She did apply to several and interviewed, however she was not offered employment. Probation continued to suggest other employment opportunities as well as local temp agency's, however the undersigned was often met with resistance or excuses as to why she could not apply.

Probation followed up with Ms. Stuart on November 22, 2024 through text messages regarding employment. This date is important as she had police contact on November 20, 2024 and had been interviewed about the conduct that lead to her arrest. During this conversation, Ms. Stuart reported she had been busy with job interviews and applications. She noted that she was working the Department of Labor with a career path specialist and had an appointment with them the following week. She did not mention her discussion with Bristol Police or the allegations being made against her.

Throughout supervision, Ms. Stuart has made basic aspects of supervision difficult and more often than not was not truthful with probation. She was not forthcoming with information and was unwilling to work with the undersigned in a positive and productive manor. Probation attempted to make every effort to assist is Ms. Stuart in being successful, however Ms. Stuart chose a different path, disregarding her conditions and engaging in new criminal conduct as alleged in this report.

Submitted By:

[signature]

Lisa van Sambeck
U.S. Probation Officer

Reviewed and Approved By:

[signature]

Victoria Aguilar
Supervising U.S. Probation Officer

Approved On:

February 25, 2025

**From:** Lisa van Sambeck
**To:** Huang, David (USACT); Stickney, John (FD)
**Subject:** [EXTERNAL] Fwd: conditions for Stuart, 21cr83
**Date:** Wednesday, February 26, 2025 11:14:59 AM

Hello all,

Please see the following conditions listed below. The judge asked that I send the following conditions she intends to impose for your review prior to the hearing.

Thank you!

Lisa

a. You must not incur new credit card charges above $500 or open additional lines of credit without the approval of the probation officer. You must not add any new names to any lines of credit, and you must not be added as a secondary card holder on another's line of credit.

b. You must receive permission from the Probation Office before opening any financial account (bank accounts, credit card accounts, lines of credit, and any online, cryptocurrency, or app-based financial account such as CashApp, Zelle, Venmo, PayPal, or Square).

c. You shall not use any name other than her true, legal name—Jessica Marie Stuart—in connection with any employment, lease, financial account, or any income-deriving activity.

d. You will complete and submit a financial statement under the penalties of perjury listing all financial accounts within two weeks with supporting documentation (bank accounts, credit card accounts, lines of credit, and any online, cryptocurrency, or app-based financial account such as CashApp, Zelle, Venmo, PayPal, or Square), whether in your name, an alias, an entity, or another person, in which you have direct or indirect access. You shall also provide follow-up financial information as requested by Probation. You shall close any account that is not in her own name within 30 days of beginning supervision.

e. The U.S. Probation Office is authorized to notify third parties, including employers and potential employers, of your criminal history or personal history and characteristics, and is authorized to obtain employment information from any employer, including job application and payment records. You must execute any releases necessary for your employer to release this information to Probation.

f. You shall not obtain any loans, personal or from family without the approval of the United States Probation office.

State of Connecticut
Judicial Branch



# Criminal/Motor Vehicle Conviction Case Detail

***Information is accurate as of August 28, 2025 05:12 AM***

## Defendant Information

**Last, First:** STUART JESSICA M **Represented By:** 401727 PUBLIC DEFENDER-NEW BRITAIN JD

**Birth Year:** 1982

## Docket Information

| | | | |
|---|---|---|---|
| **Docket No:** | H15N-CR25-0352759-S | **Original Arresting Agency:** | LOCAL POLICE BRISTOL |
| **Court:** | New Britain GA 15 | | |
| **Costs:** | | **Original Arrest Date:** | 1/12/2025 |
| | | **Sentenced Date:** | 7/3/2025 |

**Overall Sentence Information**
Conditional Discharge

| Statute | Description | Class | Type | Occ | Offense Date | Plea | Verdict Finding | Verdict Date | Fine | Fee(s) |
|---|---|---|---|---|---|---|---|---|---|---|
| 53a-128d | <$500 On Revoked Payment Card | A | Misdemeanor | 1 | 8/8/2024 | Nolo Contendere | Guilty | 7/3/2025 | $0.00 | $0.00 |

**Sentenced:** 11 Months Jail, Execution Suspended, Conditional Discharge 2 Years

Back



Copyright © 2025, State of Connecticut Judicial Branch