# United States Court of Appeals
# For the Second Circuit

August Term 2025
Argued: February 27, 2026
Decided: September 3, 2026

No. 25-599

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

JESSICA STUART,

*Defendant-Appellant*.

Appeal from the United States District Court
for the District of Connecticut
No. 03:21-cr-00083
Sarala V. Nagala, *Judge*.

Before: LOHIER, *Chief Judge*, JACOBS and SACK, *Circuit Judges*.

Defendant-Appellant Jessica Stuart appeals from a judgment entered in the United States District Court for the District of Connecticut (Nagala, *J.*), sentencing her for a violation of supervised

release and imposing a new special condition of supervised release. That condition authorizes the Probation Office "to notify third parties, to whom [Stuart] may present a risk including employers and potential employers, of [Stuart's] criminal history and past criminal conduct." App'x 164. On appeal, Stuart contends that the district court improperly delegated its authority to the Probation Office by vesting it with sole discretion to determine who qualifies as a third party to whom Stuart presents a risk. **AFFIRMED**.

---

JOHN J. STICKNEY, Assistant Federal Defender, *for* Terence S. Ward, Federal Defender, District of Connecticut, Hartford, CT, *for Defendant-Appellant*.

DAVID T. HUANG (Elena Lalli Coronado, *on the brief*), Assistant United States Attorneys, *for* David X. Sullivan, United States Attorney for the District of Connecticut, New Haven, CT, *for the United States of America*.

---

DENNIS JACOBS, *Circuit Judge*:

Inevitably there is play in the joints as one distinguishes between [1] the permissible implementation by the Probation Office of a judicially imposed condition and [2] the impermissible imposition of a condition by the Probation Office itself.

Defendant-Appellant Jessica Stuart appeals from a judgment entered in the United States District Court for the District of Connecticut (Nagala, *J.*), sentencing her on violations of supervised release and imposing a new special condition of supervised release. That condition authorizes the Probation Office "to notify *third parties, to whom [Stuart] may present a risk* including employers and potential employers, of [Stuart's] criminal history and past criminal conduct." App'x 164 (emphasis added).[1] The issue is whether the district court thus improperly delegated its authority to the Probation Office by vesting it with (as Stuart contends) "sole discretion in determining who qualifies as" a third party to whom Stuart presents a risk. Appellant's Br. 13**.**

[1] The condition further provides as follows: "The probation officer is authorized to obtain employment information from any employer, including job application and payment records. You must execute any releases necessary for your employer to release this information to Probation." Stuart does not challenge this portion of the condition. Appellant's Reply Br. 1–2.

We **AFFIRM**. The district court sufficiently cabined the discretion of the Probation Office to prevent it from exercising authority reserved to the judiciary or wielding authority arbitrarily.

Although the condition as written is expansive, it is permissible nevertheless because Stuart's conduct presents variable risks. A judge is not in the position to gauge these risks in real time and therefore must delegate to the Probation Office supervision and execution of the sentence. The court took account of Stuart's offenses, their number and variety, and the means used to commit them. More particular instructions to the Probation Office cannot easily be formulated, and if formulated, could be evaded by a person who, like Stuart, acts opportunistically.

The account of offenses that follows is offered to illustrate the point.

# I

## A. The Underlying Offense and Initial Sentence

This case began in spring 2019, when Stuart obtained employment under false pretenses. She held herself out as a Board-Certified Behavioral Analyst ("BCBA") and purported to render applied behavioral analysis ("ABA") services to children diagnosed with autism spectrum disorder, and to their families. Stuart, who was not a BCBA, impersonated a real one, whose name and credentials she appropriated.

Stuart collected at least $143,000 in pay from the service provider that employed her, and caused her employer to submit $369,439.96 in fraudulent claims to Medicaid, which requires that treatments be given by licensed practitioners.

When questioned in November 2020 by investigating agents of the Federal Bureau of Investigation and Department of Health and Human Services Office of the Inspector General, Stuart admitted

that she was not a BCBA and had impersonated a real one. She pleaded guilty in June 2021 to one count of health care fraud in violation of 18 U.S.C. § 1347 and one count of using false identification in connection with another crime in violation of 18 U.S.C. § 1028(a)(7), (b)(1)(D), and (c)(3)(A). Addressing Stuart at sentencing in October 2021, Judge Meyer, to whom the case was then assigned, located Stuart's criminal conduct within a broader "pattern" of apparent "fundamental dishonesty." Gov't App'x 68–69.

Stuart had previously been convicted of other crimes, including issuing a bad rent check in 2018 for nearly $2,500.

In 2019, Stuart moved temporarily into the home of an 89-year-old woman, whose dogs Stuart was previously hired to walk. The woman's daughter, who lived on the premises, noticed that jewelry and cash were missing, that unauthorized transactions were charged to a bank card which had also gone missing, and that $15

checks for dog-walking had been doctored to pay Stuart considerably larger amounts. The daughter told police that, though Stuart had claimed to work at a nearby school, a school administrator told her that the (fortunate) school had decided not to hire her because of her questionable professional background. Stuart was thereafter convicted of forgery and larceny.

Separate conduct in 2019 led to yet another larceny conviction. Another roommate of Stuart's, who also shared an address with her mother, reported to police that her mother's property started disappearing after Stuart helped clean her mother's bedroom. The roommate also reported finding her purse in Stuart's car, along with jewelry belonging to the roommate and her mother.

The court sentenced Stuart to 27 months' incarceration and three years' supervised release.

B. <u>Supervised Release Violations</u>

Stuart was released from prison and began her term of supervised release on December 1, 2023. Within a year, the

government petitioned for a compliance review hearing because, it asserted, Stuart violated two conditions of supervised release. It represented that Stuart failed to make court-ordered restitution payments and had moved to a new residence without notifying the Probation Office or securing its approval.

Stuart was again arrested in January 2025. While working at an organization providing services to people with disabilities, Stuart had twice used a food stamp card taken from one of the residents to run up more than $1,600 in charges. She had applied for this job by using permutations of her name and misrepresenting her employment history. Police initially interviewed Stuart about the matter months before her eventual arrest, and she violated the condition requiring her to report such a contact with police.

The government accordingly filed a petition alleging violations of Stuart's supervised release terms and moved to detain her pending further proceedings. Stuart's counsel instead raised the

prospect of a new condition designed to address "further deception with employment," Gov't App'x 152, under which employers would be notified of Stuart's criminal history. The court ordered Stuart detained pending further proceedings.

The government later learned that Stuart had continued collecting unemployment checks for weeks after securing employment, and that she had previously secured a position (with yet another employer) which she obtained by using a modification of her legal name to bypass a background check.

Stuart was ultimately charged with three supervised release violations, two for committing other crimes (food stamp and unemployment frauds), and one for failing to notify the Probation Office that she had been questioned by the police. Stuart admitted to the third charge; Judge Nagala, to whom the case had by then been assigned, found the first two by a preponderance of the evidence.

C. The Special Condition

The government sought a sentence of seven to ten months' imprisonment, as well as the imposition of a new condition of supervised release authorizing the Probation Office "to notify third parties, including employers and potential employers, of [Stuart]'s criminal history." App'x 61. The probation officer proposed that the condition require notification of Stuart's personal history and characteristics in addition to her criminal history. Stuart's counsel raised two objections.

[1] While conceding that a condition requiring Stuart to "notify[] potential employers of her criminal history" would be "incredibly . . . useful," counsel objected that the expanded notice about her characteristics and personal history would be overly broad. App'x 105–06; *see also* App'x 108. The government agreed that "the main thing is really her criminal history." App'x 131–32.

[2] Stuart's counsel also objected that the inclusion of "third

parties" appeared "overly broad" since it was unclear "what a third party would mean under that condition." App'x 139. At the court's request, the probation officer explained that third parties included only people in roles that would put them at risk of Stuart's conduct: A vulnerable person who hired Stuart or let her into their home would be notified, while a friend of Stuart's would not.

The court then proposed a revised condition authorizing the Probation Office "to notify third parties . . . to whom Ms. Stuart may present a risk, including employers and potential employers, of Ms. Stuart's criminal history and past criminal conduct." App'x 142. Stuart's counsel asked that the condition be limited to people Stuart lives with or to employers. The court ruled that doing so would render the condition underinclusive; if for example Stuart started her own business, the condition would not apply to "children or other patients" to whom she provided services. App'x 143. Acknowledging "some ambiguity" regarding "to whom Ms. Stuart

may present a risk," the court "trust[ed] that the probation office will use good judgment in determining who those people are." App'x 143.

Ultimately, the court imposed the following condition: "The U.S. Probation Office is authorized to notify third parties, to whom you may present a risk including employers and potential employers, of your criminal history and past criminal conduct." App'x 164.

The court explained that this condition was "necessary in order to ensure that anyone who hires Ms. Stuart is aware of her criminal history and can make appropriate modifications to her job responsibilities or otherwise just at least be on notice of them . . . ." App'x 152. It reflected "the minimal condition necessary to ensure that those with whom Ms. Stuart may come in contact and to whom she poses a risk because of her criminal history can go in eyes wide open as to her past criminal conduct." App'x 154.

The court imposed this condition along with a sentence of ten months' incarceration and an additional two years' supervised release. Stuart was released from custody on September 19, 2025.

**II**

As a threshold matter, the government contends that Stuart's challenge to the condition is not fully ripe. Although it concedes ripeness insofar as the condition authorizes notification to employers, potential employers, people Stuart lives with, and patients or customers she may serve if she becomes self-employed, the government disputes ripeness as it applies to notification to any other potential third party. But this approach recognizes as ripe only delegation challenges that would be defeated.

"Ripeness is a constitutional prerequisite to the exercise of jurisdiction by federal courts." *United States v. Traficante*, 966 F.3d 99, 106 (2d Cir. 2020) (alteration adopted and citation omitted). "The ripeness doctrine springs from both Article III limitations on judicial

power and prudential concerns about avoiding premature judicial interference in an evolving situation." *United States v. Villafane-Lozada*, 973 F.3d 147, 150 (2d Cir. 2020). Thus, federal courts avoid entanglement in abstract disputes over matters "that are premature for review because the injury is merely speculative and may never occur." *United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004) (citation omitted).

"In addressing any and all ripeness challenges, courts are required to make a fact-specific determination as to whether a particular challenge is ripe by deciding whether (1) the issues are fit for judicial consideration, and (2) withholding of consideration will cause substantial hardship to the parties." *United States v. Balon*, 384 F.3d 38, 46 (2d Cir. 2004) (alteration adopted) (quoting *United States v. Quinones*, 313 F.3d 49, 58 (2d Cir. 2002)).

"[W]hen a challenge to a condition of supervised release involves a pure question of law, we regularly allow that challenge to

proceed years or even decades before the defendant begins his term of supervision," *United States v. Salvador*, 180 F.4th 470, 476 (2d Cir. 2026) (internal quotation marks and citation omitted), so long as "the delegation is not conditioned on future events." *Villafane-Lozada*, 973 F.3d at 152. That is because the court has already delegated the challenged authority to the probation officer, and future events would not change our analysis. *See id.* at 151–52. Accordingly, arguments that conditions vest impermissible discretion in a probation officer are generally ripe. *Id.* "We do not need to know anything about how the condition will actually be operationalized" to resolve such challenges; "[w]e just need the words on the page." *Salvador*, 180 F.4th at 477.

We have occasionally dismissed challenges to special conditions as unripe when those challenges depend on the future state of a rapidly evolving technology that will be used to effectuate the condition. *Id.* at 476. But Stuart is "challenging the *already*

realized delegation of judicial power to a probation officer, not some hypothetical decision that this delegation might allow in the future." *Villafane-Lozada*, 973 F.3d at 151.

The government relies on *United States v. Traficante*, in which we ruled unripe a challenge to a standing order that replaced in all judgments a prior standard risk condition with a new one. 966 F.3d at 104, 106–07. The new condition authorized risk notification only if the district court determined in consultation with the probation officer that the defendant posed a risk of further offenses, which might never happen. *Id.* at 104, 107. And even if it made that determination, the district court could itself require the defendant to notify the at-risk individual or order the probation officer to require the defendant to do so. *Id.* at 107. "In either scenario, the probation officer would lack discretion over whether to impose a notification obligation." *Id.* Because "the ostensibly improper delegation may never actually occur," we concluded that the defendant's challenge

was unripe. *Id.* at 106–07.

We have distinguished *Traficante* when, as here, the delegation "has already occurred and is not contingent on future judicial action." *Villafane-Lozada*, 973 F.3d at 151. Stuart's challenge implicates the probation officer's "already-granted authority" to notify certain categories of people to whom she presents a risk, rather than any choice to notify a particular person at a particular time. *Id.* "That delegation was either proper or not — and its propriety does not depend on how (or even whether) the probation officer might later choose to wield the delegated power." *Id.* (quoting *United States v. Cabral*, 926 F.3d 687, 696 (10th Cir. 2019)); *see also United States v. Jimenez*, 175 F.4th 341, 354 (2d Cir. 2026) ("*Villafane-Lozada* directs our attention to whether a challenge hinges on a 'hypothetical' situation that may or may not occur, or on the plain terms of the condition itself."). Addressing the propriety of this already-realized delegation now rather than later avoids

hardship for Stuart and the government alike. Stuart's delegation challenge is therefore ripe.

## III

Operating in the field, a probation officer can take account of risks that a judge is in no position to monitor; and the scope of delegation may properly be expanded when, as here, the defendant's risk-creating conduct is especially opportunistic and creative.

We review the imposition of a condition of supervised release for abuse of discretion. *United States v. MacMillen*, 544 F.3d 71, 74 (2d Cir. 2008). When such a challenge raises an issue of law, "we review the imposition of that condition *de novo,* bearing in mind that any error of law necessarily constitutes an abuse of discretion." *Id.* at 74–75. We may construe the condition's terms "in a manner that avoids the problematic implications that might be suggested by an

aggressively literal reading of their text." *United States v. Kunz*, 68 F.4th 748, 761 (2d Cir. 2023); *see also id.* at 764–65.

Stuart's challenge concerns one issue: the district court's delegation of third-party risk notification authority to the Probation Office.[2] "[T]here are limits on a [d]istrict [c]ourt's ability to delegate judicial authority to a probation officer." *United States v. Young*, 910 F.3d 665, 669 (2d Cir. 2018). They are rooted in the principle that "[t]he power to impose special conditions of supervised release . . . is vested exclusively in the district court." *United States v. Matta*, 777

---

[2] Stuart does not challenge the condition insofar as it authorizes the Probation Office to notify employers of criminal history and criminal conduct other than her offense of conviction. We accordingly do not reach the question whether such a condition is an "occupational restriction" that must be specifically "based on the offense of conviction." *United States v. Peterson*, 248 F.3d 79, 85 (2d Cir. 2001) (per curiam). *Compare id.* at 85–86 (vacating condition insofar as it required notification of offenses other than the instant offense of conviction, citing 18 U.S.C. § 3563(b)(5) and U.S.S.G. § 5F1.5(a)(1), which require occupational restrictions to be "based on the offense of conviction") *with United States v. Brown*, 173 F.4th 45, 51 (2d Cir. 2026) ("[S]ince *Peterson*, we have upheld employer-notification requirements without subjecting them to the special requirements for occupational restrictions.").

F.3d 116, 122 (2d Cir. 2015). Consequently, "the extensive supervision mission of federal probation officers includes executing the sentence but not imposing it." *Kunz*, 68 F.4th at 765 (citation omitted); *see also United States v. Franklin*, 838 F.3d 564, 568 (5th Cir. 2016) ("The imposition of a sentence, including the terms and conditions of supervised release, is a core judicial function that cannot be delegated." (internal quotation marks and citation omitted)).

The question becomes whether a district court has crossed the line of permissible delegation by giving a probation officer the power to impose a condition, rather than merely execute one. A court crosses this line when it delegates "authority which would make a defendant's liberty itself contingent on a probation officer's exercise of discretion," *Matta*, 777 F.3d at 122, since doing so is "tantamount to allowing the probation officer to decide the extent of the defendant's punishment — authority reserved exclusively for

the district court." *United States v. Carlineo*, 998 F.3d 533, 537–38 (2d Cir. 2021); *see Matta*, 777 F.3d at 122–23.

The government, in passing, expresses doubt that this condition implicates a protected liberty interest. But we need not resolve the question. Stuart contends that the district court gave Probation powers that we have prohibited district courts from delegating. *See MacMillen*, 544 F.3d at 76–78; *United States v. Peterson*, 248 F.3d 79, 85–86 (2d Cir. 2001) (per curiam); *United States v. Boles*, 914 F.3d 95, 110–12 (2d Cir. 2019). Regardless of whether these cases [1] establish that third-party risk-notification conditions like this one implicate a liberty interest or [2] impose limits on delegation in this context for another reason, we remain bound by them. The government does not argue otherwise, opting instead to "assum[e] *arguendo* that notification implicates a protected liberty interest." Appellee's Br. 43.

To determine whether a district court impermissibly

delegated judicial power, we ask whether the court left a condition's implementation to the officer's "unfettered discretion." *See Peterson*, 248 F.3d at 86; *MacMillen*, 544 F.3d at 77; *Boles*, 914 F.3d at 112.

In *United States v. Peterson*, we remanded for clarification of two conditions of supervised release that concerned third-party risk notification. 248 F.3d at 85–86. A challenged standard condition provided for notice, "*as directed by the probation officer*," to "third parties of risks that *may* be occasioned by the defendant's criminal record or personal history or characteristics." *Id.* at 85 (second emphasis added). A related special condition granted the probation officer discretion to determine, "due to the defendant's criminal history and/or offense conduct," whether "a third-party risk notification *may be required*. *If required*, the defendant must notify his employer of his conviction and/or criminal history." *Id.* (emphasis added).

Because "the court must determine, rather than leaving to the

discretion of the probation officer, whether such notification is required," we remanded for the district court to clarify whether notification was mandatory. *Id.* at 86. And if the court on remand believed notification should only be mandatory "for certain types of employment but not others," it could "specify guidelines to direct the probation officer," but could not "simply leave the issues of employer notification to the probation officer's unfettered discretion." *Id.*

Similarly, in *United States v. Boles*, we vacated a condition requiring the defendant to give notice "[i]f the probation officer determines that [he] pose[s] a risk to another person . . . ." 914 F.3d at 110–11. Because the condition gave the probation officer "unfettered discretion with respect to the [employer] notification requirement," it was "largely indistinguishable" from the condition we vacated in *Peterson*. *Id.* at 112.

But we upheld a similar condition in *United States v.*

*MacMillen*. 544 F.3d at 76–78. The defendant was convicted of possessing computerized images of child pornography accessed via the internet; a special condition "authorize[d] the probation office to address third-party risk issues [with] the Defendant's employers." *Id.* at 73–74 (alterations in original). The district court at sentencing explained that since employers often provide access to computers, it was important to ensure that the defendant's employers "underst[oo]d the potential risks." *Id.* at 74.

*MacMillen* distinguished *Peterson* because the condition was limited to specific types of employment, and the nature of the offense provided the probation officer with sufficient guidance to identify risk. *Id.* at 77–78. While the district court in *Peterson* "provided no guidance to Probation as to what types of employment might require risk notification," the district court in *MacMillen* tied the defendant's "risk issues" to jobs where the defendant could access computers. *Id.* at 77. And the child pornography offense

"adequately inform[ed] Probation" of the relevant risk; notification was required when the defendant could access child pornography on a work computer. *Id.* So when considering "whether and in what situations an employer should be informed" of the conviction, the probation officer would not "be operating in a vacuum." *Id.*

In essence, we ask whether the probation officer "is equipped with a standard of decision that constrains its discretion and avoids arbitrary use of its delegated authority." *Kunz*, 68 F.4th at 766.

Here, the district court sufficiently cabined the probation officer's discretion. It adequately defined the risks Stuart poses and therefore gave the probation officer sufficient guidance to identify the people subject to them. In context, the "risk" is that Stuart will engage in opportunistic fraud and larceny that fits no pattern, at the expense of anyone in her orbit to whose property she enjoys access. The district court explained as much when it articulated the need for those "to whom she poses a risk *because of her criminal history*" to "go

in eyes wide open *as to her past criminal conduct*." App'x 154 (emphasis added).

Stuart acted by impersonation, false credentials, misrepresentations of her history and name, doctored instruments, food stamp fraud and unemployment fraud, stealing a bank card, pilfering from hosts, and purloining a purse. She stole from a landlord, her roommates, her roommates' families, the government, large institutions, and vulnerable individuals alike, in amounts large and small.

That criminal history and conduct also make clear enough the wide categories of people endangered and the risks they face. They include, as the district court explained, employers and potential employers, people Stuart lives with, and people to whom Stuart may provide services if self-employed. Given Stuart's range and pattern of similar criminal conduct, the district court gave the probation officer as much guidance as the defendant's protean offenses

allowed, without imposing parameters that create means of evasion. The probation officer is free in these circumstances to identify new areas in which this judicially defined risk may materialize, even though the district court could not enumerate every opportunity for fraud and larceny that may present itself; a judge, who is not in the field, cannot be expected to do so.

The district court sufficiently defined the risks posed by Stuart and found it necessary to notify third parties of them. It determined that third-party notification was warranted and identified the class of vulnerable people requiring such notice. The Probation Office's remaining task is to identify instances where that risk materializes on the ground. That function is more akin to "executing" the condition than "imposing it." *Kunz*, 68 F.4th at 765 (citation omitted).

For the foregoing reasons, we **AFFIRM** the judgment of the district court.